**PETER KIEWIT SONS' CO.**, a Corporation, and **Morrison-Knudsen Company, Inc.**, a Corporation, Acting as Joint Contractors and Co-Venturers

v.

**The UNITED STATES.**

No. 283-52.

United States Court of Claims.

June 5, 1957.

Ward E. Lattin, Washington, D. C., and W. C. Fraser, Omaha, Neb., for plaintiffs. Gardner, Morrison & Rogers, Washington, D. C., and Fraser, Crofoot, Wenstrand, Stryker & Marshall, Omaha, Neb., were on the briefs.

Francis X. Daly, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiffs, Peter Kiewit Sons' Co. and Morrison-Knudsen Company, Inc., were partners in a joint venture to perform a construction contract made with the United States. The plaintiffs sue for damages alleged to have been suffered by reason of the increased costs of performance of the contract which were due to delays claimed to have been caused by the Government's breach of the contract.

On or about the 28th of March 1947, the plaintiffs and the Government, acting through the Bureau of Reclamation, Department of the Interior, entered into a standard form Government contract. Under this contract the plaintiffs were to construct earthwork and structures for the Estes and Marys Lake power plants, the parking area adjacent thereto, the gatehouse, spillways, and penstock connected to the power plants. The Estes and Marys Lake power plants were part of a much larger project known as the Colorado-Big Thompson Project, which is an extensive hydroelectric and irrigation project located on the east and west slopes of the Continental Divide in the state of Colorado. Other parts of the overall Colorado-Big Thompson Project were constructed by different contractors under separate contracts with the Government.

The work to be performed by the plaintiffs was covered in Schedules I, II, and III of the specifications accompanying the contract. Schedule I covered the Estes power plant, switchyard, and parking area; Schedule II the Marys Lake power plant with its switchyard and parking area; and Schedule III the spillway for Marys Lake, the penstock gate structure and penstock for both Estes and Marys Lake. Plaintiffs submitted separate bids for Schedules I, II, and III, but stated on the last page of the bids that if the Government accepted and awarded them contracts for all three of the schedules, then they could deduct from the total contract price the sum of $238,000. The Government accepted plaintiffs' bid on the combined three schedules for the total contract price of $2,176,708, which took account of the $238,000 reduction from the separate bids by the plaintiffs on the three schedules. This amount, together with additional sums for extras and changes not here in issue, has been paid to the plaintiffs.

The contract provided that the work should be completed within 900 calendar days after the Government gave notice to proceed. This notice was given to the plaintiffs on May 3, 1947, and called for completion of the contract by October 19, 1949. Under the terms of the contract the plaintiffs were to supply all labor and equipment and some of the material, and the Government was to furnish the steel penstock for both plants, steel and iron pipes and fittings, electrical conduits, metal sash windows, and plumbing fixtures. The contract was extended several times by the Government. Completion dates as finally fixed by the Government, and met by the plaintiffs, were:

Schedule I.   October 18, 1950
Schedule II.  September 18, 1950
Schedule III. September 30, 1950

The plaintiffs sue for $261,792.72 which they allege is the increased cost resulting from delays in the performance of the contract, which delays are claimed to have been occasioned by breaches of contract by the Government. Plaintiffs' claim is broken down into two separate categories: Penstock and General and Concrete.

### Penstock

Under Schedule III of plaintiffs' contract, they were to construct a gatehouse at the lower terminal of the Rams Horn Tunnel. Rams Horn Tunnel carried water to the eastern slope of the Continental Divide and was to provide the necessary water for the Marys Lake power plant. From the gatehouse, which regulated the flow of water from the Rams Horn Tunnel, a single 96-inch diameter penstock was to be installed to carry the water to the Marys Lake power plant, a distance of 482 feet. Penstock is a tubular steel conduit. The schedule also provided for the construction of a gatehouse at the lower terminal of another tunnel, Pros-

pect Mountain, to regulate the flow of water into the Estes power plant. Three parallel lines of penstock, each 78 inches in diameter, were provided to carry the water a distance of 3,941 feet from the gatehouse to the Estes power plant. ·The penstock was delivered to the sites in various lengths to fit specified areas of installation. The Marys Lake penstock consisted of 18 sections, and the Estes penstock 432 sections which were to be installed in three lines of 144 sections each.

The plaintiffs' original plan of construction provided for the installation of the penstock during the period from approximately May 1, 1948 to October 31, 1948. A revised schedule for the installation of the penstock was prepared and submitted to the defendant about March 18, 1948, and called for completion of the penstock installation by December 1, 1948. However, actual delivery by the Government of penstock to the sites did not start until May 26, 1948, and the final delivery· was not received until August 20, 1949. Installation was started by the plaintiffs August 1, 1948, and was completed about September 17, 1949. The plaintiffs claim damages for this delay.

In anticipation of its needs in supplying the penstock for the Marys Lake and Estes power plant projects, the defendant solicited bids for the fabrication of the required penstock. The bids called for opening on June 24, 1946, which was some nine months before the plaintiffs' contract was entered into. The bid of the Darby Corporation of Kansas City, Kansas, hereinafter called Darby, was low. Darby notified the Bureau of Reclamation that delivery of the required penstock could be made within 450 days from the time that notice to proceed was given. An inspector of the defendant reported that Darby could meet the requirements for the supply of the needed penstock and could arrange for its deliveries to agree with the schedule of the general contractor. On October 25, 1946, the defendant wrote to Darby notifying it of the award of the contract to it and

stating that the performance period would commence with the receipt of the award. Darby received the notice October 28, 1946. The Darby contract provided for the completion of the 96-inch penstock section for the Marys Lake power plant within 360 days from the receipt of the award and the completion of the 78-inch penstock sections for the Estes project within 720 days. Thus the completion dates for the fabrication of the penstock were October 23, 1947 for Marys Lake, and October 17, 1948 for Estes. Darby completed the Marys Lake penstock by June 30,·1948, and delivered it to the site in July of that year. It completed the Estes penstock about August 13, 1949, with final delivery to the site by August 20, 1949. Much of the delay in the delivery of the penstock was caused by the shortage of steel and the difficulty that Darby was having in finding and maintaining a source of supply of the plate steel needed for the manufacture of the penstock. This difficulty began sometime before the award of the plaintiffs' contract in March 1947.

Recognizing the difficulty that Darby was encountering, the Government attempted to secure priorities assistance for Darby so that manufacture of the penstock could begin on schedule. The contracting officer for the Darby contract determined that the delay in completing the 96-inch penstock for the Marys Lake power plant resulted from causes within the control of Darby, since it had received the steel for this penstock in August and September of 1947, but had used it in fabricating penstock under another contract with the Government which was left after the Marys Lake and Estes contract, but called for an earlier delivery date. He also found that 34 percent of the steel required for the Estes penstock was available in March 1948, but that commencement of its manufacture was delayed until April due to the other penstock contract with the Government. The contracting officer further found that production of penstock was delayed a total of 205 days between the period April 1948 and April 1949, due

to excusable delays caused by the shortage of steel.

The plaintiffs were not advised of the delays in the manufacture of penstock as soon as the Government knew of them and not until November 1948 were they advised that their revised installation schedule could not be met.

The Government kept an inspector on duty at the Darby plant to see that the penstock for the Marys Lake and Estes projects conformed to specifications and to speed up operations wherever possible. As Darby fell behind, the Government attempted to assist it in obtaining the necessary steel and on February 16, 1949, the Secretary of the Interior requested the Secretary of Commerce to assist in getting the approval of an allocation of steel for the Bureau of Reclamation's projects which included the Marys Lake and Estes power plants. At this time P.L. 395, 80th Congress, 1st Session, 61 Stat. 945, 50 U.S.C.A.Appendix, § 1911 et seq., was in effect. It was a law whereby a voluntary allocation plan was set up by industries dealing with scarce commodities, steel among others. The Steel Products Advisory Committee was established under this law and allotted quantities of steel for distribution to users when, in the judgment of the Committee, it would tend to stabilize the national economy in areas of production where there was a critical shortage as an aftermath of World War II. This law was passed on December 30, 1947, but in the early period of its existence applications were not made to the Steel Products Advisory Committee by the Government on an agency basis. It was not until the Department of the Interior made its application for steel for the Bureau of Reclamation projects in 1949 that an agency of the Government had applied for an allocation on such a basis. It is not shown that had such an application been made before this time it would have been accepted and acted upon favorably by the Advisory Committee. As a result of the application in 1949, steel was made available to Darby for use in fabrication of the penstock needed by the plaintiffs.

On February 1, 1950, the contracting officer for the plaintiffs' contract issued his findings of fact with respect to the delays caused by the penstock and other items of work. He determined that the plaintiffs were prepared to install penstock by May 1, 1948, as planned, and except for the rate and order of delivery, the plaintiffs would have completed installation by January 31, 1949. He granted an extension of time of 226 days under Schedule III of the contract. This extension was granted on the ground that another contractor had not completed construction of the Prospect Mountain Tunnel, and therefore the plaintiffs could not construct the Estes gatehouse until the tunnel was completed. Since the construction of the gatehouse and the penstock all came under Schedule III, the contracting officer did not allow any extension of time specifically for delay in the delivery of penstock, because the installation of the penstock could be performed concurrently with and independently of the gatehouse structures. The plaintiffs did not object to these findings since the time extension under all of Schedule III was sufficient for them to install the penstock without having liquidated damages assessed against them for late completion. We have found that the plaintiffs were delayed approximately eight months in the installation of penstock at an increased cost to the plaintiffs of $21,560.50.

The plaintiffs claim that the failure of the Government to deliver the penstock as needed by them for the orderly and economical prosecution of their work was a breach of contract. In support of this contention, the plaintiffs point out that the Government knew at the time it entered into its contract with the plaintiffs that the supplier of the penstock was having trouble in obtaining plate steel, and that after entering into its contract with the plaintiffs, the Government contracted with the same supplier of penstock, Darby, for other penstock, which contract called for an earlier delivery date. The plaintiffs also say that the

Government did not fulfil its contractual obligations by doing everything that was possible to supply the required penstock, since it was not until a year and a half after the passage of P.L. 395 that it requested an allocation of steel for the reclamation projects.

Generally the Government is not liable for delays in making the work or material available to a contractor, United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53; United States v. Howard P. Foley Co., 329 U.S. 64, 67 S. Ct. 154, 91 L.Ed. 44. However, where the Government or its authorized representatives are guilty of some act of negligence or willful misconduct which delays the contractor's performance, the Government is liable for the resulting damages, Chalender v. United States, 119 F.Supp. 186, 127 Ct.Cl. 557. This is so because there is in every Government contract, as in all contracts, an implied obligation on the part of the Government not to willfully or negligently interfere with the contractor in the performance of his contract, Chalender, supra; George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70. When the contract does not specify particular dates upon which delivery of the material is to be made, the implied obligation just referred to is an obligation not to willfully or negligently fail to furnish the materials in time to be installed in the ordinary and economical course of the performance of the contract, Walsh v. United States, 102 F.Supp. 589, 121 Ct.Cl. 546; Thompson v. United States, 124 F.Supp. 645, 130 Ct.Cl. 1; Chalender, supra. If the Government exerts every effort to supply the contractor with the necessary materials on time, it cannot be held that it has willfully or negligently interfered with performance, Otis Williams & Co. v. United States, 120 Ct.Cl. 249; W. E. Barling v. United States, 111 F. Supp. 878, 126 Ct.Cl. 34.

We think that the Government acted without proper and adequate consideration for the interests of the plaintiffs in regard to the penstock. When it gave the plaintiffs notice to proceed, which is a notice to get the equipment and the men on the job for the efficient performance of the work, it knew that Darby was having difficulties getting the necessary raw materials, and it had no right to surmise, at the plaintiffs' expense, that the situation would improve in time for Darby to meet its schedule of deliveries. The Government's further conduct, in placing another contract for penstock with Darby, and giving it priority in delivery over the contract on which the plaintiffs depended, was inexcusable. It could be justified only upon the assumption that the Government may, with impunity, do whatever is good for its own interests, regardless of the harm which may result to individuals. The Government breached the implied obligation described above, and the plaintiffs were damaged thereby in the amount of $21,560.50. They are entitled to that sum on the penstock claim.

### General and Concrete

The plaintiffs claim $220,126.79 as increased costs in overhead and general expense and the increased costs of pouring concrete, caused by the delays of the Government in delivering materials, other than penstock, and drawings necessary for the performance of the contract.

Under the contract the defendant was required to furnish all materials intended to be installed in concrete structures, other than reinforcing bars. This consisted primarily of iron and steel pipes, pipe fittings, electrical conduits and metal sealing strips. The placement of the concrete could not be done until this material, together with drawings showing exactly where the material was to be placed, were furnished the plaintiffs. The defendant's contracting officer found that the plaintiffs were delayed 214 days on the Marys Lake power plant and 184 days on the Estes switchyard, in addition to 60 days allowed for changes ordered by the contracting officer. The time thus allowed, plus 86 days for an ironworkers' strike and 34 days for a strike by laborers, was adequate to avoid the assessment of liquidated damages against the plaintiff.

The plaintiffs claim that the delays, other than those caused by the strikes and authorized changes, were caused by the defendant and amount to a breach of its contract for which plaintiffs have the legal right to recover damages in the amount of the excess cost caused by the delays. The Government on the other hand contends that its delays in furnishing materials and drawings were not, in the circumstances, breaches of contract, and that the plaintiffs were entitled only to extensions of time because of the delays.

In April of 1947, the plaintiffs submitted their proposed construction schedule with respect to the work to be performed under Schedules I, II, and III of the contract. Schedules I and II included the work for which the plaintiffs claim the additional costs for general overhead and concrete. Under the construction program for Schedules I and II, it was proposed that the period needed for completion of the Estes power plant, switchyard and parking area would be from May 1, 1947 to August 15, 1949, and for Marys Lake from September 1, 1947 to July 1, 1949. Plaintiffs' letter transmitting the above construction program stated in part:

> " * * * In order to comply with the above schedule, the building and reinforcing details will be required at an early date, this would also require an early delivery of items to be installed in, or below these structures, such as, drainage pipes, electrical conduits and other miscellaneous embedded materials."

Plaintiffs' proposed construction program was acknowledged by the construction engineer for the Government by a letter of June 20, 1947, which stated that it "appears in general to be possible of accomplishment". Thereafter the plaintiffs submitted five separate revised construction programs calling for later completion dates.

It was not customary in the Bureau of Reclamation to order materials, other than those requiring special design, such as penstock, turbines and generators, in advance of the award of a contract such as the one with the plaintiffs. Therefore, no efforts were made to obtain the necessary materials for the plaintiffs' contract until about April 1947. However, at the time that the award was made to the plaintiffs, materials of the type here involved were in short supply and hard to obtain, and the Government experienced great difficulty in getting the needed material under its normal procurement methods, and it was obliged to resort to other means. Awards were made to higher bidders because of better delivery dates. Local warehouses were checked for available materials that could be used as substitutes, and some substitutions were made necessitating changes in drawings. In some instances duplicate orders were placed with different suppliers, and the first delivered was accepted and used.

The other item contributing to the overall delay in plaintiffs' performance was the failure to receive detail drawings as they were needed in order to proceed with concrete pourings. The defendant's contracting officer did not consider delays due to the late delivery of drawings, when he allowed extensions of time for the performance of this contract. However, we have found that at least fifty percent of the delays herein involved were caused by the failure to receive the drawings and that this disrupted plaintiffs' plan of construction and the normal sequence of installing embedded materials and the placing of concrete. We have found that plaintiffs' increased costs attributable to delays on the part of the Government for its General and Concrete claim amount to $116,059.50. The question, therefore, is whether or not the Government's failure to deliver the items called for under the contract at the time they were needed was a breach of contract.

In order to determine this question we must look, as in the case of the penstock claim, to the acts of the Government and its agents. We do not think that the Government's failure to supply the plaintiffs with the materials needed

for embedding is, under the facts in this case, a breach of the contract. The Government did everything possible to supply the plaintiffs with the materials in light of the short supply available on the market. We do not think there was negligence by the Government in failing to procure the materials in advance of the notice to proceed, because under its normal procurement system such materials would have been available in time for the contractor to proceed with the orderly and timely performance called for under the contract. By this, we do not mean to imply that there would never be circumstances amounting to a breach of contract where the Government followed what it terms as its "normal" procurement methods, but only that under the facts as presented herein no such breach is shown.

The claim involving the embedded materials is quite distinguishable from the penstock claim. As previously pointed out, the Government was well aware that penstock would not be available at the time it ordered the plaintiffs to proceed and actually committed acts which increased the delay in the delivery of penstock. No such acts are shown with respect to the embedded materials. The claim insofar as it concerns the embedded materials falls within our decision in the Barling case, supra, and plaintiffs cannot recover for delays attributable thereto.

█ In regard to the delays caused by the Government's failure to supply the plaintiffs with detail drawings as needed, we think that the failure was an act of omission which was a breach of contract

for which plaintiffs may recover their damages. There is nothing in the record to show why these drawings should not have been prepared and delivered on time. It is true that some 2500 detail drawings were involved, but when plaintiffs were given notice to proceed by the Government, they had every right to expect timely delivery of the drawings in order to enable them to perform as required, and the Government's failure is a breach for damages can be awarded. The mere volume of work involved is not an adequate reason for excusing the Government from liability for its failure.

█ It is impossible to determine exactly the amount of delays directly attributable to the Government's failure to supply these drawings, but we have found that at least fifty percent of all delays included in the General and Concrete claims were caused by the delay in furnishing the drawings. The inability to directly assign an item of cost or extra expense to a breach is no bar to recovery, Chalender, supra, and we will allow plaintiffs to recover fifty percent of the amount of damages found to be attributable to the Government's delays involved in the General and Concrete claims. Plaintiffs are therefore entitled to recover on account of late delivery of drawings the sum of $58,029.75.

Judgment will be entered for the plaintiffs in the total amount of $79,590.25.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.