**H & S MANUFACTURING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–381C.**

United States Court of Federal Claims.

July 18, 2005.

Marc Lamer, Philadelphia, PA, for plaintiff.

Claudia Burke, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant.

## *OPINION*

CHRISTINE O.C. MILLER, Judge.

This case is before the court subsequent to trial after the Government terminated a contract for failure to deliver timely Aircrewman Survival vests used by downed flyers from helicopters and fixed-wing aircraft in survival and rescue situations. Plaintiff contractor claims the Government provided deficient specifications that caused it to incur additional expense and delay; conducted arbitrary and capricious inspections of the product; and, as a result, improperly terminated the contract. Trial revealed that despite its exhaustive demonstrations and discussion regarding the fabrication of the equipment, plaintiff could not demonstrate any inappropriate government action.

### FACTS

1. *The solicitation and contract*

The Defense Logistics Agency, Defense Supply Center, Philadelphia ("DSCP") issued Solicitation SP0100–97–R–2001 (the "Solicitation") on February 24, 1997. The subsequent contract called for the production of 10,968 Type I Aircrewman Survival vests (the "Airsave vest" or the "vest"), 2,334 Type

II[1] Airsave vests, 1,022 knife pockets, 1,022 radio pockets, 2,595 general pockets, a total of 3,951 heed pockets, and 233 pistol pockets, which were to be used by the United States Navy (the "Navy") and the United States Army (the "Army"). On May 21, 1998, H & S Manufacturing, Inc. ("plaintiff"), was awarded Contract No. SP0100–98–C–6001 in the amount of $1,813,648.70. Plaintiff manufactures textile products for the Government and was engaged in manufacturing projects prior to the contract at issue.

The Solicitation was specific to a number of issues pertinent to this matter. First, it emphasized the required submission of a Product Demonstration Model (the "PDM") with each offeror's bid. Page four of the Solicitation recited that the PDM was "to demonstrate the offeror's ability to translate from the specification to an actual end item.... The PDM is considered to be the most important factor because it will demonstrate the offeror's capability to produce the end item free of defects and in conformance with the specification." In order to judge offerors' submissions based on this standard, the Solicitation limited offerors to one submission of a PDM, with no acceptance of subsequent submissions to correct deficiencies.

The Solicitation contained a Technical Data Package ("TDP"), which consisted of, "among other items, specifications, purchase descriptions, patterns and drawings." Once it received the contract, plaintiff was required to submit a "first article"[2] at the beginning of the production process. Of significance was DSCP's disclaimer of responsibility for any faults in the TDP after plaintiff had completed the first article. Plaintiff was responsible for reviewing the entire TDP and alerting DSCP to any deficiencies or changes that needed to be addressed. This review was to "include identification and recommended changes to correct deficiencies which may adversely affect production, fabrication or assembly of the contract items, in the quantities specified, in accordance with all of the technical data." Although any changes made as a result of this review would be at "no cost" to plaintiff, section 52.210–9P06 of the Solicitation informed plaintiff that once it produced the first article it "warrant[ed] that it is responsible for any deficiencies it fails to uncover during production of the first article and in its detailed review and analysis of the [TDP]." John E. Holland, now employed as a manager at JHRD LLC, was president of plaintiff and testified that this clause informed plaintiff of its "responsibility to review the technical package, and give DSCP technical information that needed to be changed, if any, before presenting the first articles." Transcript of Proceedings, *H & S Mfg., Inc. v. United States*, No. 01–381C, at 54 (Fed.Cl. May 26, 2005) ("Tr."). Mr. Holland strictly defined this responsibility, however, and distinguished it from the functionality of the vests: "We looked at our responsibility to ... be able to manufacture the item as [DSCP] had put together, not to make the item function." Tr. at 55. Plaintiff's responsibility thus was to identify production problems.

Prior to plaintiff's submission of the first article, plaintiff communicated with DSCP on a variety of issues. It was apparent that plaintiff did nothing short of conduct a letter-writing campaign[3] to DSCP during the time surrounding the submission of the first article. While plaintiff elaborated on numerous issues at trial, only those pertinent to the resolution of the present matter will be discussed in detail. Plaintiff had many concerns in preparation of the first article, including the flame retardant requirement for the nylon webbing on the vests; the heed pockets and the hose pocket patterns; the

---

1. A "Type I" vest is equipped with a leg harness that allows the user to be hoisted up by the vest in a rescue operation. A "Type II" vest does not have a leg harness.

2. Submission of a "first article" demonstrates a contractor's ability to produce the product and allows the customer to inspect it before the product enters full production.

3. As one example, on November 11, 1998, plaintiff wrote as many as four letters in one day to DSCP. Mr. Holland explained that he was "sending [letters] as we found [the problems].... I didn't wait to recap [the problems] because [I] was under the gun every day to get these first articles done, so ... these [letters] are written ... as [the problems] happened." Tr. at 89.

color of the vests; the harness type on the Type I vests; the velcro placement on the heed pockets; the placement of the bartack on the heed pockets; the cut length of the general and radio pockets; the cut angles on the pistol pocket; and the use of a plastic heed gauge, as opposed to a wooden gauge, to check pocket dimensions.

After plaintiff submitted the first article for inspection in early March 1999,[4] it was quickly rejected on March 9, 1999, in a report provided by DSCP (the "First Article Report"). The First Article Report listed visual and dimensional defects for the products in the first article. These defects were classified as "critical," "major," or "minor."[5] The First Article Report noted thirty-six visual defects (including nine critical and nineteen major defects) and eleven dimensional defects. One of the primary defects that became problematic throughout the production process was evidenced by notations for defects in Type I vests: "Operation not properly performed, W-stitching . . . don't extend to end of webbing," and "[o]peration not properly performed, W-stitching points, not evenly aligned[.]"[6] The latter defect speaks to the requirement that demands the spacing between the "Ws" be equally aligned. DSCP categorized these as major defects.

Mr. Holland responded with a March 15, 1999 memorandum addressing the defects in the First Article Report of March 9, 1999. Specifically, he argued that thirty of the conditions cited by DSCP were not defects. Re-

garding the WW-stitching, listed at Item 14 in his memorandum, he noted that the defect marked as "unequal spacing" was not a defect because "[t]here is no plus or minus tolerance for typical dimensions and there is no defect listed for 'not evenly aligned.'" This lack of tolerance remained an issue throughout production, as both Mr. Holland and Major Edward Langwinski, currently an instructor with the Army Logistics Management College and formerly the Contracting Officer at DSCP during the time pertinent to this matter, indicated at trial that no such tolerance existed or could be recalled.

Mr. Holland followed this memorandum with a March 16, 1999 letter to Albert Gatica, also a Contracting Officer at DSCP, in which he addressed further the problems listed in the First Article Report and in his previous memorandum. Mr. Holland then wrote a March 17, 1999 letter concerning the template location of components during the manufacturing process. In a March 26, 1999 letter, Mr. Gatica denied a request by Mr. Holland to place a reinforcement of binding tape or webbing between the male snaps and the raschel knit.[7]

Subsequent to these communications and expressed concerns, plaintiff submitted the second version of its first article. On April 29, 1999, based on visual and dimensional requirements, DSCP approved the first article sample and authorized production. Mr. Gatica thereafter sent plaintiff an April 30,

---

4. This first article included samples of each identical item that would be used in the complete vest to be produced by plaintiff. This submission consisted of: sixteen vests of both Type I and Type II variety; forty pockets for each of the knife, radio, general, heed (Type I), heed (Type III), and pistol/ammo pockets; and forty samples for each of the oxygen and flashlight attachments.

5. A "critical" defect is one that is life-threatening. A "major" defect falls between a critical and minor defect and "with wear and tear, [could] result in harm to the user." A "minor" defect would not be likely to cause harm to the user. Def.'s Br. filed Apr. 19, 2005, at 5. Additionally, according to Mr. Holland, a major defect is "[s]ometimes repairable, sometimes not repairable[,]" and will likely significantly impair the function of the product for its intended purpose. Tr. at 129–30; *see* Pl.'s Br. filed Apr. 8,

2005, ¶ 61. Mr. Holland also testified that a minor defect does not affect the product's "fit, form and function" and does not effect the product's use, but is a visual imperfection. Tr. at 130.

6. "W-stitching" or "WW-stitching" is the reinforcement stitching used on the harness straps for the Type I vests. The two "W" formations face each other to create four points at the top and four points at the bottom of the harness strap. Pl.'s Br. filed Apr. 8, 2005, ¶ 67. Defendant notes that proper WW-stitching "is required to ensure that the vest can hold the user's full weight if the user is hoisted from the water during a rescue operation." Def.'s Br. filed Apr. 19, 2005, at 6.

7. Mr. Holland explained that "[r]aschel knit is all of the knit product that makes up the vest[.]" Tr. at 65.

1999 letter addressing Mr. Holland's March 15–17 letters, in which DSCP amended the categorization of defects from the First Article Report by either maintaining, deleting, or reducing the defect, including revising the uneven WW-stitching alignment deficiency from a "major" to a "minor" defect.

### 2. *Production, delivery, and inspection*

Plaintiff presented the vests and pockets in lots; each lot was subject to an inspection process. According to defendant, the inspections were three-fold: They included a visual inspection; a dimensional inspection to determine the precision of measurements; and a "fit test," which ensured that pockets and other areas of the vests and pockets designed to hold objects could, indeed, support those items. Def.'s Br. filed Apr. 19, 2005, at 5. The inspections were intended to be carried out by a team of inspectors that included Leo Bailey, the Contracting Officer's Representative (the "COR") and a Quality Assurance Specialist (the "QAS") at DSCP, and at least one Quality Assurance Representative (the "QAR"). Army and Navy inspectors often were also present, as well. *Id.* at 4–5. To inspect each lot, inspectors took a statistically valid sample from the lot and inspected those items based on the three categories within the review. *Id.* at 5.

Although plaintiff began production of the vests and other items after receiving authorization on its first article, problems persisted during the production process that caused plaintiff to fall behind in the production schedule. For example, questions remained as to the WW-stitching. This led Mr. Bailey, in a May 10, 1999 memorandum, to instruct Jim Vinson, a QAR serving as an inspector, to give special attention to the WW-stitching during inspection because it was still an area of concern after the first article approval.

Per the contract, plaintiff was scheduled to begin delivery of Type I and Type II vests, along with other items called for by the contract, on August 13, 1999. Plaintiff met the delivery requirement for Type II vests in August 1999 by presenting 200 Type II vests.[8] Due to delays in production, however, which plaintiff attributed in part to its hardware supplier, DSCP on October 13, 1999, issued Modification P00011 ("Modification 11") to the contract, which was the first alteration of delivery dates. Modification 11 altered the delivery schedule, and required plaintiff to renew delivery with a shipment of 340 Type I vests, 213 Type II vests, and a large quantity of pockets by October 31, 1999. Major Langwinski testified that the revision to the delivery schedule "wasn't the government's fault. It was the contractor's fault[.]" Tr. at 997. The modification of the delivery schedule bears this out in the notation that plaintiff's "delinquency or anticipated delinquency is not excusable[.]"

Although close, plaintiff's October 31, 1999 delivery did not comply with the schedule set forth in Modification 11 and varied from the quantities specified. Per Modification 11 plaintiff was to deliver 340 Type I vests and 213 Type II vests; instead, it delivered 330 and 210 of the respective vests. While these deviations were minimal, plaintiff also failed to deliver any of the 881 pockets called for on the Modification 11 delivery schedule, which precipitated a Show Cause Notice of November 4, 1999, from Contracting Officer James Haverstick. This Notice was followed by a warranty action on December 3, 1999,[9] against the 200 Type II vests shipped in August 1999 for failures revealed during inspection. A second warranty action, for vests shipped on October 19, 1999, was contemplated in a January 18, 2000 Warranty Recommendation from John Skrabonja, Product Services Manager, Equipment Branch, at DSCP.

During this period DSCP and plaintiff engaged in discussions aimed at identifying how plaintiff could best produce the vests and pockets and ultimately deliver them in a timely fashion. Throughout the discussions, plaintiff continued to experience difficulty in meeting delivery and production deadlines. These conversations culminated in a December 15, 1999 meeting between plaintiff and

---

8. Shipment records are kept via a form labeled "DD Form 250." This form serves as an invoice, inspection, and shipping report.

9. This warranty action was revised through a December 22, 1999 warranty letter.

DSCP. Mr. Holland testified that the primary focus of the meeting was directed towards the fit and function of the general pocket, as many of the defects cited in the inspection of plaintiff's initial shipments of vests addressed pocket defects.

A major reason for DSCP's concerns with plaintiff's delay was the needs of the end customers, the Army and the Navy. A December 21, 1999 memorandum from the Navy to DSCP questioned the ongoing delayed receipt of the vests and cited the warranty actions against plaintiff as causes for such delay. S.A. Ashton, Jr., Program Manager for the Aircrew System at Naval Air Systems Command Headquarters, went on to request that DSCP provide the status of other contracts and awards in the procurement of the vests. The Army similarly was concerned with the delay of production and shipment: A December 13, 1999 memorandum for DSCP from Lt. Col. Steve S. Pinter indicates that "the Army aviation community [was] waiting" on the shipment of vests from plaintiff because it was phasing out an old vest and relying on the shipments of the new Airsave vests to fill its supply needs.

After the October 19, 1999 shipment, plaintiff's next shipment of vests and other items did not occur until June 28, 2000. During that period plaintiff and DSCP corresponded about plaintiff's concerns regarding production matters. On January 3, 2000, plaintiff asked DSCP for a "written procedure" of the fit test [10] for the general pocket, as discussed at the December 15, 1999 meeting between the parties. Two days later, on January 5, 2000, Mr. Holland sent by facsimile transmission to DSCP a question concerning the pattern for the edges of the pockets. Another fax was sent on January 8, 2000 from plaintiff to DSCP questioning the fold and stitch line on the radio pocket; specifically, Mr. Holland testified that the spacing on the pocket after stitching was complete was not in accordance with the radio pocket gauge that was to fit into the pocket during the fit test. Tr. at 243–44. DSCP cumulatively responded to plaintiff's concerns in a January

13, 2000 letter. Mr. Holland testified that none of the pocket issues discussed in DSCP's letter surfaced during the first article inspection; instead, he hypothesized that the inspectors were using drawings to make inspections even though, as stated in this letter, government drawings were not to scale.

Shortly thereafter, on February 9, 2000, DSCP issued Modification P00014 ("Modification 14"), which provided new dimensions for the radio and pistol pocket gauges. On the following day, a warranty action was recommended by Mr. Skrabonja for the October 19, 1999 shipment of 160 Type I vests and 100 Type II vests. Of note were the continued fit problems on the general pockets for both Type I and Type II vests. Plaintiff pursued the matter with a March 1, 2000 fax to Major Langwinski asking for clarification of a drawing line on the general pocket pattern. In a March 28, 2000 letter, Major Langwinski responded that the line in question was a fold line. Mr. Holland directed a letter of April 1, 2000, to Major Langwinski's attention emphasizing the importance of patterns in the TDP and pointing out the same line marking on the radio pocket drawing that, without clarification, might be a source of confusion. From this exchange, plaintiff presented a letter of April 3, 2000 from Dallas R. Sanders, the QAR, to Major Langwinski. In his letter Mr. Sanders concluded that he could not inspect plaintiff's processes "with conflicting instructions as in your letter dated 28 March 2000[.]" Mr. Sanders cited an incongruency because "[p]age 1 of this letter states that the fold line is the solid line pictured on the pattern, [but] the note on page 2 in this letter states that all side[,] back and front dimensions shall be uniform." As his April 3 letter explains,

> This can not happen on the side dimension because when the operator forms the bottom of the pocket, the operator has to fold in 3/8" seam allowance into making the seam. Which in turn moves the natural

---

10. A "fit test" is the use of a dimensional gauge in the shape of the item, *e.g.*, radio, pistol, or general pocket gauge, that allows the manufacturer to ensure the proper size of the pocket based on the size of the item intended for use in the pocket. The item should be placed in and removed from the pocket with little effort.

fold line in 3/8" from where it is indicated on the current pattern.

Mr. Holland continued to remain in contact with DSCP and Major Langwinski as production progressed via updates on pocket patterns. DSCP responded to various letters from plaintiff in an April 28, 2000 letter indicating its desire to "work with H & S Manufacturing, Inc. in order to make this contract work." Major Langwinski's letter stressed that the TDP was sufficient for plaintiff's needs in manufacturing the products in this contract and that the Government would consider proposed alterations from plaintiff, as long as plaintiff provided two samples of any product that was a result of an alteration so that the Government could review the effect on the end product.

As a result of plaintiff's production problems, Major Langwinski amended the delivery schedule for a second time on June 8, 2000, in Modification P00017 ("Modification 17").[11] Compared to Modification 11, Modification 17 allowed that the "Contractor's delinquency or anticipated delinquency may be excusable[.]" The first due date on Modification 17, August 15, 2000, required plaintiff to submit 886 Type I vests and 160 Type II vests, along with an assortment of pockets. Prior to that due date, plaintiff delivered 2,645 general pockets on June 28, 2000; this delivery, according to Mr. Holland, completed the line item requirement for general pockets. Mr. Holland testified that plaintiff did not receive complaints from DSCP or a warranty action concerning these pockets. Tr. at 302.

Plaintiff's next inspections were not as fortunate. Lots I and II consisted of 200 Type I vests and 100 Type II vests, respectively, and were inspected on July 18 and 19, 2000, respectively. Lot I was rejected during inspection of a sample of thirty-two vests due to the omission of one box X stitch pattern and one velcro pile omission from the bottom of the back panel. These omissions were categorized as critical defects. Thirteen minor defects, including missing serial numbers and snap fasteners not mated correctly, also were listed. The rejection of Lot I led to Corrective Action Request Number [H & S] Manufacturing 2000-01 from Mr. Sanders on July 19, 2000. Mr. Sanders explained that the deficiencies found "exceeded the end item acceptance criteria in accordance with [the applicable specification,]" and that plaintiff was required to perform a "100% re-inspection" of the lot quantity, along with an inspection of work being performed on vests for similar defects. Mr. Sanders presented plaintiff with an itemized list of actions that plaintiff was required to take and requested a report of the results of such investigation by August 18, 2000.

Plaintiff's Shipment Number 6 occurred on July 24, 2000, and consisted of 290 various pockets, including knife, heed, radio, and pistol pockets. According to Mr. Holland, those items were accepted without incident. On August 8, 2000, plaintiff sent Shipment Number 7, which consisted of 300 Type I vests and 100 Type II vests. These vests comprised Lots III and IV, respectively, for inspection purposes. Both Lots passed inspection. Also on August 8, plaintiff dispatched Shipment Number 8, consisting of an assortment of 655 knife, radio, heed, and pistol pockets.

Up to this date, plaintiff was not behind in the delivery schedule per Modification 17. According to that schedule, plaintiff was to deliver 886 Type I vests by August 15, 2000. In plaintiff's Shipment Numbers 9 and 10 on this date, however, 386 Type I vests were delivered. In the corresponding Lot V inspection, a lot size of 400 vests was accepted.[12] Nevertheless, this shipment placed plaintiff behind schedule for delivery of vests.

---

11. DSCP did not contemplate termination of the contract based on the Show Cause Notice of November 4, 1999, because Major Langwinski deemed that the Notice was no longer useful due to the time delay that had occurred, and that "if you take too much time between termination and the notice, some people could perceive that the government waived its rights[.]" Tr. at 1031. Instead, Major Langwinski instituted a new delivery schedule under Modification 17 "in order to reassert the delivery schedule." Tr. at 1033.

12. A slight difference exists between the corresponding DD Form 250s, the Product Verification Record (the "PVR") for Lot V, and testimony at trial. Following the order of shipments and inspection dates, the DD Form 250s for Shipment Numbers 9 and 10 should correspond

During this period, on August 15–16, 2000, Mr. Sanders and Peter Ricket, a QAS and government inspector from the Navy, visited plaintiff's plant to inspect Shipment Numbers 9 and 10. Mr. Ricket's August 21, 2000 Trip Report on Production Lot Inspection of CMU–33/P Survival Vests noted that Messrs. Ricket and Sanders scored defects against the shipment.[13] More significant to Mr. Ricket's report, however, was the discussion of Mr. Holland's actions toward the two government inspectors during their visit to plaintiff's plant. Mr. Ricket reported that Mr. Holland addressed him in a disparaging way when Mr. Ricket noted that the identification label in the vests was an incorrect size; the conduct was repeated when there was a question as to radio pockets becoming distorted when snapped into place. Ironically, neither of these problems actually was scored as a defect. Mr. Ricket termed Mr. Holland's language "verbally abusive[.]" A third interaction occurred when Mr. Holland, according to Mr. Ricket's report, returned to the plant still upset about the possible deficiencies and challenged Mr. Ricket's knowledge in this field.

As evidence of the Government's willingness to work with plaintiff, Mr. Ricket further explained in his August 21, 2000 Trip Report that either he or Mr. Holland would ask the production supervisor to replace discrepancies found in a variety of pockets, as opposed to marking them as defective. Because of this, "[t]here were more than enough minor discrepancies to reject this lot but we decided to try to work" with plaintiff and not score minor discrepancies that had been addressed and fixed. Subsequently, in an email to Major Langwinski, Mr. Sanders affirmed Mr. Ricket's description of the latter's interactions with Mr. Holland, but altered some of Mr. Ricket's discussion concerning defects that were not scored.[14]

These events were followed by an August 24, 2000 letter to Major Langwinski from Mr. Holland, in which the latter addressed plaintiff's difficulty in maintaining smooth operations in production of the vests, including difficulty with hardware supplies. Mr. Holland then proposed to ship 250 Type I vests and 796 Type II vests by September 15, 2000. While this would maintain the quantity of vests per Modification 17, it altered the type of vests being shipped because plaintiff was attempting to fill the Type I void with Type II vests. Major Langwinski responded to this proposal through a September 1, 2000 Cure Notice in which he stated that plaintiff's proposed substitution of vests was "endangering performance of the contract." Major Langwinski allowed plaintiff ten days to cure the problem condition; if such cure did not occur, DSCP could terminate the contract. Major Langwinski also addressed Mr. Holland's actions toward Messrs. Ricket and Sanders during their inspection on August 15–16 and informed him that such actions in the future would also endanger contract performance.

Mr. Holland responded to the Cure Notice in a September 6, 2000 letter to Major Langwinski. He reiterated plaintiff's issue with its hardware supplier and advised that the supplier was out of stock for the hardware needed for the Type I vest. Hence, plaintiff again proposed to ship 250 Type I vests and 796 Type II vests by September 15. Once the hardware supply resumed at the end of September 2000, Mr. Holland stated that plaintiff would begin shipping 1,046 Type I vests by October 15, with subsequent shipments of 1,046 Type I vests per month until the delivery schedule was back on track. Finally, Mr. Holland addressed his frustration with Mr. Ricket during the August 15–16 visit. According to Mr. Holland, DSCP had been sending various inspectors, some of whom were new and unaware of agreements

to Lot V; however, the PVR for Lot V, and Mr. Holland's testimony, list a lot size of 400 vests, whereas the combined total of Type I vests on Shipment Numbers 9 and 10 is 386 Type I vests.

13. These defects included a missing stitching seam on a general pocket; missing stitching on the inside of a vest by the lower pocket; and a radio pocket that "had a dura-dot stud and eyelet

combination that was incompatible with the Pull-the-dot cap and socket combination[.]"

14. Mr. Sanders's remarks appear in an August 28, 2000 email from Major Langwinski to other individuals involved in the matter. Mr. Sanders's comments are not dated on Major Langwinski's email.

and interpretations between plaintiff and DSCP.

Plaintiff's adherence to the contract's delivery schedule did not improve. On September 19, 2000, plaintiff presented Lot VI, which consisted of 796 Type II vests. Modification 17 called for delivery of 886 Type I and 160 Type II vests on September 15, 2000. Per Mr. Bailey's inspection, despite the quantity inadequacies, this Lot was accepted. Lot VII, consisting of 250 Type I vests, also was presented and inspected on September 19. This Lot was rejected due to thirteen minor defects, which were noted as "bartack misplaced" and "w-w stitching wrong gage." [15]

In what serves as minimal support of plaintiff's contention of inconsistent inspections, however, Major Langwinski testified that, subsequent to the acceptance of Lot VI, the Navy did not accept the 796 Type II vests, despite Messrs. Sanders's and Bailey's approval. Additionally, a September 28, 2000 Navy memorandum regarding the vests commented that it is "statistically improbable" that Lot VI passed inspection while Lot VII failed inspection. Because these vests were produced on the same line, the proportion of deficiencies between the Type I and Type II vests should have corresponded, but they did not. Despite the Navy's disapproval, Major Langwinski testified that

> regardless [of] what the Navy said, [the vests] met the terms and conditions of the contract.... [R]egardless [of] what the Navy wanted to do, the [G]overnment had to accept [Lot VI] because it was conforming to the contract. That's why we took them even though the Navy said they wouldn't accept them after the fact.

Tr. at 1090–91.

Due to the rejection of Lot VII, Mr. Sanders issued Corrective Action Request Number H & S Manufacturing 2000–02 on September 21, 2000. This Request gave plaintiff until October 19, 2000, to complete its own investigation of the deficiencies and informed plaintiff that corrective action was required

before Lot VII was presented again for inspection.

Mr. Holland responded to this Corrective Action Request via letter dated September 25, 2000. He informed Mr. Sanders that plaintiff determined that no corrective action was necessary on the WW-stitching. Mr. Holland stated that corrective action would be taken on the pattern and drawing for the radio pocket so that the gage of the webbing would be correct. The letter noted that the gage of the webbing on the radio pocket in this lot was the same as that of the PDM and first articles, and that it had been deemed acceptable until this lot. Mr. Sanders's October 16, 2000 response informed Mr. Holland that the lack of corrective action on the WW-stitching was an unacceptable response. Because of this, Lot VII remained deficient. Plaintiff was given until October 30, 2000, to complete its investigation and corrective action on this deficiency.

Mr. Holland's immediate October 17, 2000 response to Mr. Sanders's letter reiterated plaintiff's stance that the WW-stitching issue was not a defect. Instead, Mr. Holland explained that "[it] is a minor manufacturing adjustment when the sewing procedure is performed using a single needle class 7 machine. It has been an acceptable procedure in the manufacturing process up until [L]ot VII." The letter cited the acceptance of this manufacturing procedure by the Army and Navy technical staff for all lots through Lot VI. Finally, Mr. Holland argued that other procedural changes by plaintiff were approved and accepted by DSCP as "minor manufacturing adjustment[s]" that did not affect fit, form, or function of the product.

While discussion concerning the September 21 Corrective Action Request was ongoing, Major Langwinski issued a September 29, 2000 Show Cause Notice to plaintiff. According to Major Langwinski, Modification 17 required plaintiff to deliver 2,102 Type I vests by September 15, 2000. As of September 15, plaintiff had shipped 1,216 of these vests, rendering plaintiff delinquent in the amount of 886 Type I vests. Mr. Holland's

---

**15.** Mr. Bailey testified that Lot VII would have failed based solely on the bartack deficiencies because those defects amounted to eleven bartack misplacements. The rejection level was eight defects within the lot sample size; hence, on bartacks alone, Lot VII failed. Tr. at 1293.

October 2, 2000 response indicated that plaintiff could not proceed with manufacture of Type I vests due to an interpretive issue with the WW-tacking (stitching). According to Mr. Holland, the WW-stitching method was scored as a defect in Lot VII, although that method had been accepted in prior lots and in plaintiff's PDM and first article. Because of this apparent misunderstanding, Mr. Holland informed Major Langwinski that no further Type I vests could be shipped until the WW-stitching matter was resolved. Mr. Holland proposed an extension of the Type I delivery schedule by seventy-five days, to include $1,500.00 in consideration for the Government. In his October 20, 2000 reply, Major Langwinski informed plaintiff that the delivery schedule of Modification 17 would be enforced. Major Langwinski also remarked that "the manual procedures as described for your sewing operation [have] been previously accepted. The majority of the WW stitching inspected fell within the acceptable range." In reference to a contract drawing, the letter noted that the WW-stitching requires "4 points equally spaced." Mr. Holland nonetheless was adamant that plaintiff had never been informed about the acceptable range for this spacing.

After the shipments and inspections of 796 Type II vests and 250 Type I vests on September 19, 2000, the next presentation of vests for inspection, according to the PVRs, did not occur until November 2, 2000. On that date Lots VIII and IX, consisting of 650 Type II vests and 118 Type I vests, respectively, were rejected. At the same time, the WW-stitching issue remained a problem. Per a November 7, 2000 DSCP memorandum referencing a letter from plaintiff of October 22, 2000, in which plaintiff asked for the standard for spacing between the WW-stitching, Jean F. Rosso, Product Services Manager, Equipment Branch, wrote that "[i]f the W–W stitch is not within the tolerances specified, the hoisting harness strength can be compromised possibly resulting in a severe injury or fatality." Major Langwinski testified that he could not remember those tolerances.

The culmination of the delinquent deliveries appeared in DSCP's November 9, 2000 Termination Notice to plaintiff. By that date plaintiff had missed two deliveries of Type I vests, resulting in a delinquency of 1,772 Type I vests. The termination was effective only for the Type I vests. According to Major Langwinski, plaintiff "wasn't a reliable source of supplies to the government[.]" Tr. at 1050. He explained that the termination was made as quickly as possible before the next delivery date occurred so that plaintiff had notice of the termination. Major Langwinski reiterated this termination in a March 28, 2001 [16] letter denying plaintiff's request in its claim letter for reconsideration of the termination decision.

Despite the problems with the Type I vests, Major Langwinski was confident that plaintiff could fulfill the contract requirements in regard to the Type II vests and the various pockets. In the time subsequent to the Type I termination, the only inspections that occurred were the reinspections of the failed Lot VIII vests. All three of those inspections-Lots VIIIA, VIIIB, VIIIC-resulted in rejections, although by the dates of those inspections plaintiff apparently had resolved the backstitching issue that had plagued production. As a result of the failure of these lots, Major Langwinski issued a Cure Notice on February 6, 2001, notifying plaintiff that its failure was endangering performance of the contract. Major Langwinski warned plaintiff that failure to cure the defects within ten days could result in contract termination.

Although Major Langwinski believed that plaintiff could finish the contract for the Type II vests after the Type I termination, plaintiff was, in actuality, according to Major Langwinski, "unable to continue to produce conforming goods with consistency." Tr. at 1056. Plaintiff failed to deliver any new Type II vests for reinspection after the termination of the Type I vests. Lot VI, consisting of 796 Type II vests, was the last shipment of conforming vests that plaintiff presented to DSCP. This failure to perform on the contract resulted in a March 16, 2001

---

16. The date on the DSCP letter denying plaintiff's request for reconsideration of the Type I termination mistakenly appears as "March 28, 2000."

Termination Notice to plaintiff for the remaining Type II vests. In response to plaintiff's April 16, 2001 claim letter concerning the Type II vests, Major Langwinski responded in a May 2, 2001 letter that informed plaintiff of the finality of the termination decision for Type II vests.

Plaintiff filed its complaint in the United States Court of Federal Claims on June 29, 2001, seeking to deny the Government's various warranty claims in this matter, requesting an equitable adjustment against the Government in the amount of $235,663.98, and asking that the terminations at issue be converted from Terminations for Default to Terminations for Convenience and that plaintiff be awarded $420,502.80 in convenience termination costs.[17]

## DISCUSSION

The crucible of trial refined plaintiff's principal contention to a charge that the Government breached its duty to cooperate during plaintiff's performance of the contract. Pl.'s Br. filed May 13, 2005, at 1. An examination of DSCP's actions toward plaintiff in the inspection of vests produced by plaintiff, along with plaintiff's difficulty in securing reliable sources of materials and supplies, demonstrates that, while the relationship between the parties was not a paradigm of customer-supplier communication, DSCP did not hinder plaintiff's completion of the contract. Despite plaintiff's claims about DSCP's inspection activities[18] and its varied complaints during the production process, plaintiff ultimately defaulted due to its failure to adhere to the delivery schedule set forth

in the original contract and later amended in Modifications 11 and 17. This failure to meet the delivery schedule was not the fault of the Government.

### 1. *Standards*

 Judge Wolski of this court recently provided a thorough explication of the doctrines referred to as the implied duties to deal in good faith and not to hinder performance of a contract. *See generally Tecom, Inc. v. United States,* 66 Fed.Cl. 736, 2005 WL 1515902 (2005). Implicit in every contract are the duties of good faith and fair dealing between the parties. *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed.Cir. 2005). As an aspect of these duties, "[e]very contract ... imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'" *Essex Electro Eng'rs v. Danzig,* 224 F.3d 1283, 1291 (Fed.Cir.2000) (quoting *Luria Bros. v. United States,* 177 Ct.Cl. 676, 369 F.2d 701, 708 (1966)). Such covenants require each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.,* 395 F.3d at 1304. These duties apply equally to the Government and private parties. *Id.*

 Determinations of whether the duty of good faith and the duty not to hinder performance have been breached are based on similar considerations.[19] Generally, a failure to cooperate with the other party in the performance of a contract serves as a breach

17. Plaintiff subsequently withdrew its warranty claims.

18. Plaintiff presented Dr. Moon Wong Suh as an expert in statistical sampling in quality control in the textile industry. Dr. Suh reviewed the inspection results to determine the probability of receiving different results when the inspections were "coming from same inspectors, same procedures from the same plant, and primarily the same type of manufacturing procedures during roughly the same period of time." Tr. at 710. While plaintiff sought to discredit DSCP's inspection methods through Dr. Suh's testimony, and Dr. Suh testified that the comparative difference between defects found in different lots could not come from statistically tolerable errors and random variations and indeed were the result of

subjectivity, Dr. Suh was unable to demonstrate in convincing fashion that DSCP's inspections were improper. Indeed, the purpose of conducting lot-by-lot inspections is to monitor the production of the product during different times in the manufacturing process. He could not establish that a difference in lot inspection results correlates to, or is even suggestive of, improper inspection procedures. Despite Dr. Suh's impressive credentials, the court cannot accord weight to his testimony in this instance.

19. The Government's long touted desideratum that "irrefragable proof" is needed to demonstrate the absence of good faith in the administration of government contracts has been given its last rites. *See Tecom,* 66 Fed.Cl. at 766 n. 36, 2005 WL 1515902, at *30 n. 36

of that contract because a failure to cooperate violates the duty of good faith. *See Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir.1988). Notably, however, a showing of "bad faith" or "bad intent" is not required to demonstrate a breach of this implied duty. *Abcon Assocs. v. United States*, 49 Fed.Cl. 678, 688 (2001). Instead, the Restatement (Second) of Contracts is instructive: "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified." Restatement (Second) of Contracts § 205 (1981). Comparatively, the duty not to hinder is breached when the Government commits "actions that unreasonably cause delay or hindrance to contract performance." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed.Cir.1993). As such, a government official cannot "willfully or negligently interfere with the contractor in the performance of his contract[.]" *Peter Kiewit Sons' Co. v. United States*, 138 Ct.Cl. 668, 151 F.Supp. 726, 731 (1957).

### 2. *Government inspections and the duties of good faith and lack of hindrance*

■ Key to this discussion is the review of government inspections and the role of inspectors in a breach of the duties to act in good faith and not to hinder performance. This court's predecessor, the United States Court of Claims, provides thorough analysis of the treatment of government inspections, including those that should be categorized as improper. Such inspections have been deemed a breach of the duty not to hinder contract performance. *WRB Corp. v. United States*, 183 Ct.Cl. 409, 509 (1968). In *WRB Corp.* the Government had conducted "multiple inspections of the same ... work by different inspectors." *Id.* This led to conflicting approvals and disapprovals for the same products. The Court of Claims found that these inconsistent inspections "amounted to an unreasonable interference with the plaintiff in its attempt to perform the contract." *Id.* The court, however, noted that, compared to overzealous inspections, "[a] mere misinterpretation of a specification, by itself, is not enough" to demonstrate that the Government "impede[d], hinder[ed], or inter-

fere[d] with the contractor's work." *Id.* at 424.

Other Court of Claims cases explore what constitutes excessive supervision by a government agent during contract performance. In one instance, a contractor was hired to construct a concrete roadway for the Smithsonian Institution at the National Air Museum Storage Area in Silver Hill, Maryland. *Roberts v. United States*, 174 Ct.Cl. 940, 357 F.2d 938, 941 (1966). Plaintiff had made numerous technical errors in its reading of the contract drawings. This led the Government's chief inspector to take over the project and "exercise[ ] complete control and domination over all parts of the contract performance." *Id.* at 942. Despite the inspector's belief that his assertiveness was necessary, the court determined that nothing in the contract between the parties allowed for the Government's representative to assume such complete control over the contract. Even with the plaintiff's less-than-stellar implementation of the contract drawings, these acts by the chief inspector constituted a breach of the Government's implied duty not to hinder the plaintiff's performance of the contract. *Id.* at 945.

A similar situation was presented in *Adams v. United States*, 175 Ct.Cl. 288, 358 F.2d 986 (1966). Under contract with the Government, the plaintiff was to produce wood tent pins. *Id.* at 988. Like the case at bar, a sample size of each lot presented by the plaintiff was inspected to determine the acceptability of the product. If a sample contained more than the allowed major and minor defects, the entire lot was rejected. *Id.* at 989. The inspection procedures by the government inspector in *Adams* challenged the realm of reasonableness. For example, the inspector arbitrarily disregarded the inspection plan agreed to by the Government's inspection supervisor and the plaintiff; created four new inspection points, which inconvenienced the plaintiff due to their logistical arrangements; refused to inspect pins as they accumulated at an inspection station; inappropriately spoke with the plaintiff's employees regarding defects in the pins; scored defects that were not specifically prohibited by the contract specifications; relied upon a

standard for defects that altered the basic contract specifications, even though defendant did not provide the plaintiff with a copy of this standard; engaged in overzealous inspections by demanding a higher quality product than called for in the contract; failed to promptly inspect pins; and refused to allow the plaintiff to view the inspection procedure he was following. *Id.* at 990–92. These inspections resulted in as high as a fifty-percent rejection rate; when another inspector began inspections, the rejection rate dropped to as low as ten percent. *Id.* at 992. Without much consternation, the Court of Claims deemed the initial inspector's actions as "extremely rigid, unreasonable and arbitrary conduct[.]" *Id.*

The Court of Claims also discussed the actions of a government inspector in *H.W. Zweig Co. v. United States*, 92 Ct.Cl. 472 (1941). While it was addressing the question of whether a delay triggered the liquidated damages clause of the contract at issue, the court spoke to the role of the government inspector during the contract. The court found that it was clear that the "incompetency" of the inspector caused a certain amount of delay, and that the inspector did not "[know] his business[.]" *Id.* at 481. This resulted in the inaccurate acceptance of garments produced by plaintiff and caused unnecessary delay due to the extra time spent shipping the garments to and from plaintiff's factory. *Id.* at 480–81. Although not specifically opining on the duty not to hinder contract performance, *H.W. Zweig* provides insight about an improper inspection and its effect on damages.

The decisions of the Court of Claims in *Roberts, Adams*, and *H.W. Zweig* give contours for government inspections that can be characterized as inappropriate. DSCP's actions can be distinguished from governmental action that has been faulted, and DSCP's inspectors did not breach the duties of good faith and not to hinder performance. Instead, the ultimate cause of the terminations for both Type I and Type II vests was plaintiff's inability to meet the delivery schedules set forth in the original contract and then revised through Modifications 11 and 17. The court found credible the testimony of Major Langwinski and Mr. Bailey that, while DSCP's inspections were thorough, they did not hinder plaintiff's production of its product. To the contrary: DSCP attempted to help plaintiff complete the contract, as evidenced by the discussions leading up to the December 15, 1999 meeting; DSCP's April 28, 2000 letter indicating a willingness to assist plaintiff; and Mr. Ricket's Trip Report of August 21, 2000, which indicated that Messrs. Ricket and Sanders alerted plaintiff to possible problems that were not scored as defects. DSCP's inspections cannot be cited as conduct of government inspectors that the court has found inappropriate, overzealous, unreasonable, or otherwise detrimental to contract performance. The rejection of plaintiff's vests was not pretextual; the inspectors did not withhold information on defects; nor did they keep plaintiff in a state of ignorance about important performance criteria. The court found no evidence that DSCP's actions were a hindrance to contract performance or violated the duties to cooperate and not to hinder contract performance.

3. *First article requirement, failure to disclose information, and procurement customers*

Plaintiff was required to produce a first article as part of the contract. The first article was intended to demonstrate that plaintiff successfully could manufacture the products under contract. An approval of the first article was not a guarantee that all subsequent vests would be approved, as well. Instead, the lots that followed the first article were subject to individual inspections. If the manufacturing process was changed or altered, or resulted in inferior quality vests as the manufacturing process continued, DSCP had the right to reject those lots. Plaintiff's contention that Lot VII was rejected on the basis of WW-stitching, even though plaintiff's method had been approved in the PDM, first article, and prior lots, is only minimally significant. Approval of prior vests, whether in the PDM, first article stage, or previous lots, does not guarantee that all future lots will be acceptable. Indeed, the purpose of continuous inspections is to ensure that the product consistently is produced in a satisfactory

manner and to guard against changes in or degradation of the manufacturing processes.

Mention must be made of plaintiff's undue reliance on *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963), for the assertion that DSCP failed to disclose information to plaintiff, specifically regarding any concerns with the WW-stitching on Lots VI and VII. In *Helene Curtis* the plaintiff was versed in the compounding and packaging of chemicals, and it contracted with the Government to supply an extensive amount of a disinfectant chlorine powder to be used by troops serving in the Korean War. *Id.* at 775. Prior to placing its bid, the plaintiff conducted background and research investigations to ensure the feasibility of creating such a disinfectant and was confident that production could occur by a simple mixing of chlormelamine, the active ingredient, and other ingredients, and without any grinding of the chlormelamine particles. During manufacture, however, and after much struggle, the plaintiff determined that, in fact, it was necessary to grind the chlormelamine in order to reduce the particle size to meet the solubility requirement of the contract. *Id.* at 776. The costs for these delays and discoveries to the plaintiff were significant. Moreover, the plaintiff eventually learned that its supplier of chlormelamine was blending several batches of the ingredient and not shipping individual batches as they were manufactured; this resulted in a lack of uniformity within batches that caused production problems. *Id.* at 777. The plaintiff in *Helene Curtis* asserted that the Government knew of the need for grinding and of the problems that could be caused by a lack of uniformity in the chlormelamine batches, that the plaintiff had no reason to know of this information, and that the Government did not supply this information to the plaintiff.

The Court of Claims concluded that the circumstances dictated that the Government had a duty to share the information. *Id.* at 778. As reasons for such disclosure, the court cited the novelty of the product; the lack of its mass production to date; and government-sponsored research that gave the Government significantly more information than any bidder would or could know, including the fact that chlormelamine was a recent invention and that grinding would be necessary. *Id.* The court appropriately acknowledged that the Government is not a fiduciary towards its contractors, but held that, in the circumstances presented, a duty arose under which the Government was required to share information.

Plaintiff's situation in production of the Type I and Type II vests is distinguishable from the conditions presented in *Helene Curtis.* DSCP, the Army, and the Navy did not improperly withhold information from plaintiff. In fact, because DSCP and its customers were unfamiliar with the production of these vests at the inception of this contract, plaintiff was given the responsibility of reviewing and adding to the TDP. Plaintiff's further reliance on the Navy's "rejection" of Lot VI, after the Lot had been accepted by DSCP, does not establish a lack of forthright contract administration. Major Langwinski testified that, while the Navy attempted to reject the Lot, it met contract specifications. Tr. 1090–91. In response to a related argument, plaintiff cannot stand on the assertion that the Navy's disapproval of Lot VI, even though it was accepted, should have been conveyed to plaintiff. This is not a matter, as in *Helene Curtis,* "where the balance of knowledge is so clearly on [the government's] side[.]" 312 F.2d at 778. Instead, DSCP was not required to bring every questionable issue to plaintiff's attention; it was the purpose of lot inspections to inform plaintiff of any defects that DSCP deemed unacceptable. As Mr. Bailey testified, "if it was something just kind of a casual heads up, you know, be careful here, we don't necessarily, we would not say we noted it." [20] Tr. at 1296. Not only does Mr. Bailey's explanation of DSCP's

---

**20.** While Mr. Ricket's August 21, 2000 Trip Report indicates that plaintiff was made aware of issues not scored as defects, Mr. Sanders's email to Major Langwinski, recaptured in Major Langwinski's August 28, 2000 email minimized those "non-scores;" the fact that plaintiff was made aware of "some" possible defects during this one particular inspection should not have led plaintiff to assume that all possible and questionable defects would be brought to its attention prior to the actual scoring of lots on the PVR sheets.

protocol for non-defect questions fit squarely with the Government's non-fiduciary relationship with its contractor, but it demonstrates that DSCP had not misled plaintiff into assuming that any "questionable" item, whether a scorable defect or not, would be brought to plaintiff's attention.

As previously alluded to, an interesting situation arose in the contract between plaintiff and DSCP. While DSCP served as the procuring agency, two customers—the Army and the Navy—actually were the end recipients of the vests and assorted items. While multiple customers and a procuring agency could present a potentially difficult situation when determining the acceptance of plaintiff's product if one procedure is not followed, such a conflict did not occur in this instance. The Navy wanted to reject Lot VI, but Major Langwinski testified that the vests corresponded to the contract specifications and that, therefore, DSCP was required to accept them. Tr. at 1090–91. The presence of multiple end-users, along with a procuring agency, did not hinder or affect the contract between the parties.

While the push to secure the vests was admittedly provided by the Army and the Navy, which then also questioned the time delay of the receipt of the vests, plaintiff failed to demonstrate that there was a pattern of ill-will or improper determinations concerning the WW-stitching by DSCP or the end customers. Mr. Bailey's testimony concerning his communication with plaintiff was credible, and he worked with and informed plaintiff of the necessary defects. That being true, it is also true that Mr. Bailey was not required, in discussions subsequent to an inspection, to alert plaintiff to every possible defect. Those results, if deficiencies, appropriately would appear in the PVR associated with a particular lot. Ultimately, plaintiff defaulted on both Type I and Type II vests due to its failure to adhere to the delivery schedule, and the scored defects were not responsible for plaintiff's supply issues or inability to meet the initial or modified delivery schedules. Plaintiff encountered problems with its suppliers, particularly its hardware supplier. Despite plaintiff's attempt to attenuate these issues, plaintiff is not relieved from its delivery obligations. Plaintiff's offer of a compromise delivery date, including consideration of $1,500.00 to DSCP, does not relieve plaintiff of its delivery obligations. No animosity was shown through DSCP's decision to decline plaintiff's compromise; indeed, DSCP generously had extended the delivery schedule through two modifications. DSCP did not act unreasonably in refusing plaintiff's compromise.

## CONCLUSION

Accordingly, based on the foregoing, the court finds and concludes that plaintiff has not proved by a preponderance of the evidence that DSCP breached its contract with plaintiff. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.