**HELIX ELECTRIC, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 02–478C.**

United States Court of Federal Claims.

Nov. 10, 2005.

**572**

Richard D. Corona, San Diego, CA, for Plaintiff.

Sheryl Lynn Floyd, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for defendant. Richard Spector, Department of the Navy, Of Counsel.

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

WILLIAMS, Judge.

This dispute arises under a contract for the replacement of the electrical distribution system at Keesler Air Force Base (AFB) in Biloxi, Mississippi (the Contract). Plaintiff claims that the Contract gave it the right to become a cable television operator on base and that the Navy breached its implied duty to cooperate and not to hinder this aspect of Plaintiff's performance.

At issue is Section 6.2 of the Contract, which states, "[t]he Contractor must pay Cable One to relocate their [sic] [CATV] system or acquire service from another source." Def.'s App. at 35–36.[1] Plaintiff interprets the phrase "acquire service from another source" to mean that it could acquire CATV service for the base from itself. Plaintiff alleges that the Navy breached the implied covenants to cooperate and not hinder performance by requiring it to obtain a franchise and failing to respond to its requests for dispute resolution, issuing conflicting and erroneous directions on the CATV franchise application process, reversing its position on whether Helix could become a CATV provider, and delaying and ultimately preventing Plaintiff from obtaining a CATV contract on Keesler AFB. Plaintiff seeks $7,722,000 in damages, its estimation of the current market value of the CATV franchise.

This matter comes before the Court on Plaintiff's motion for partial summary judgment on liability and Defendant's cross-motion for summary judgment. Plaintiff cannot recover because the Contract cannot be interpreted in the manner Plaintiff suggests. The portion of Section 6.2 which authorized a contractor to acquire CATV services from another source was patently ambiguous in that it radically altered and exceeded the scope of work in the Contract, which was limited to relocation of the electrical distribution system from above ground to underground.[2] Plaintiff's interpretation would expand the Contract into a wholly different agreement for provision of CATV services, a function which is governed by a separate statutory and regulatory scheme. Further, Plaintiff's interpretation of the Contract as giving it the right to acquire CATV services from itself should have raised issues about the legality of this provision and caused Helix to inquire prior to bidding.[3] Because it

---

1. The existing cable access television (CATV) system on base, which was operated by Cable One, had to be relocated when the electrical distribution system was replaced.

2. Other than this phrase "acquire service from another source," nothing in the Solicitation called for the provision of CATV services by the electrical contractor. The Solicitation contained no evaluation factors for CATV services, and there was no pricing solicited for CATV services

for potential users—base activities, individual subscribers, or nonappropriated fund instrumentalities (NAFIs).

3. Specifically, under Plaintiff's interpretation, the Contract: 1) purported to confer contracting authority for a government acquisition of CATV services on a private contractor; 2) permitted Helix to engage in anti-competitive self-dealing by awarding a CATV contract to itself, raising a potential organizational conflict of interest; 3)

did not inquire, the Contract must be construed against Plaintiff, precluding its recovery.

Because the Contract did not include the provision of CATV services by Helix, the Contract does not give rise to an implied duty on the part of the Navy to cooperate with Helix in this would-be facet of its performance or impose on the Navy an obligation not to hinder Helix's performance in this regard.[4]

Accordingly, Plaintiff's motion for partial summary judgment on liability is denied, and Defendant's cross-motion for summary judgment is granted.

### Factual Background [5]

#### The Request for Proposals

On February 2, 1999, the United States Navy issued solicitation number N62467–99–R–0883 (the Solicitation), entitled "Design Build Two–Phase Changes to the Electrical Distribution System, Keesler Air Force Base, Biloxi, MS." Def.'s App. at 5. The Solicitation was issued pursuant to a Comprehensive Master Plan for Keesler Air Force Base (AFB), which detailed construction and engineering projects that were necessary to modernize the base. The project included the replacement of nearly the entire electrical system on the base including labor, equipment, and materials needed to construct substations, transformers, and distribution lines to more than 1200 buildings.[6] The Solicitation was comprised of six Parts, consisting of "Proposal Requirements" (Part 1), "Contract Forms and Conditions" (Part 2), "General Requirements" (Part 3), "Prescriptive Technical Specifications" (Part 4), "Performance Technical Specifications" (Part 5), and "Attachments" (Part 6). Funding for this procurement was provided by the FY Omnibus Appropriations Bill, Public Law 105–277.

Part 1, Section 00202, Paragraph 1.3, entitled "Specialized Project Requirement," described the project as follows:

> This RFP is for the design and construction to change the base and family housing electrical overhead systems to underground systems for a cost ranging from $34,000,000 to $37,500,000.00.... The overhead system distributes several communications systems that are a combination of station owned [7] and non-station owned systems and a street/area lighting system. This project is to provide a new base main switching/sub station, new underground power circuits including transformers and secondary conductors, and a replacement of the station owned communication systems. The contractor will be responsible for coordinating and providing facilities to allow for the relocation of communication systems that are not station owned. This will require extensive coordination with communication utility companies. Also, a new base-wide street/area lighting system is to be provided. The contractor will be responsible for coordinating the entire project. Once the underground system is operational the overhead system is to be removed in its entirety. The project will require medium

called into question the Air Force's exclusive role in awarding a CATV franchise on base and granting related base access, licensing and subscription agreements; and 4) purported to authorize the government's acquisition of CATV services without properly obligated funds.

4. Rather, the right of Helix and any other entity to become a CATV provider on Keesler AFB derives not from contact, but from compliance with statute and a mandatory Air Force instruction governing CATV franchises on Air Force bases, base access and a license to use base property, and subscription agreements.

5. For the purpose of deciding the cross-motions, the Court relies upon the pleadings, Appendices to Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment (collec-

tively Pl.'s App.), and Defendant's Appendices to its Opposition to Plaintiff's Motion for Partial Summary Judgment and Cross–Motion for Summary Judgment and response to the Court's December 15, 2003 Order (Def.'s App.), and the Contract filed by Defendant pursuant to the request of the Court.

6. Keeler AFB's electrical system was severely damaged by Hurricane Georges, which struck Keesler AFB on September 28, 1998. Declaration of John David Collins (Feb. 4, 2004) (Collins Decl.) ¶ 3, Def.'s App. at 395.

7. "Station-owned" is defined as Keesler AFB-owned equipment. Pre-proposal Conference Meeting Minutes, Def.'s App. at 20–31.

voltage live-line work, substation design/construction, medium voltage distribution design/construction, significant construction/outage phasing, outdoor lighting design/construction, communications systems design/construction, etc. This base must stay in operation for the entire duration of this project.

Def.'s App. at 9. Accordingly, the project contemplated by the Solicitation was in essence, the transfer of Keesler AFB's utility systems from overhead electrical poles to an underground system. Collins Decl. ¶ 6, Def.'s App. at 396.

Paragraph 2 of Section 00202, entitled "Technical Evaluation Factors for Phase II," listed the factors the Navy would consider in awarding the contract as follows: (i) past performance; (ii) small business subcontracting effort; (iii) technical solutions; and (iv) technical qualifications of all lead design and construction personnel. Def.'s App. at 10–13. There were no evaluation factors addressing provision of CATV services.

Section 00202, Factor C, of the Solicitation set forth the content requirements for the technical proposals that were to accompany bids. Factor C states in relevant part:

Provide a narrative of the technical solution that describes in detail the following:

1. Major equipment and materials to be incorporated into this project. Provide manufacturer catalogue data with appropriate features marked for a minimum of the following:
   a. Medium voltage cable
   b. Pad mounted switches
   c. Sectionalizing cabinets
   d. Main switchgears
   e. Regulators
   f. Load tap changing transformers

2. Discuss commitment and capabilities of the company to be used for locating underground facilities. Describe specialized equipment and methods to be utilized. Discuss commitment to repair any accidental interruptions in a timely manner.

3. Describe commitment and methods to be utilized to provide exceptional project quality throughout both to design and construction phases. Discuss commitment to specify highest quality materials during the design stage and to maintain the highest quality installation. How will subcontractors be prequalified to perform work on this project?

4. Describe the steps that will promote safety during the construction of the project.

Def.'s App. at 12.

On March 31, 1999, Amendment 0002 revised several parts of the Solicitation, including Part 6, Attachments. Def.'s App. at 1–2. This Amendment changed Paragraph 6.2 of the Comprehensive Master Plan and read as follows: [8]

n. Reference Page 61, paragraph 6.2. [Proposed Cable TV System] Existing system is owned by Cable One. The Contractor must pay Cable One to relocate their system or acquire service from another source. Requirements are for service to residential areas with 2000 dwelling units (subscription to service is an occupant decision), 250 full rate drops and 2000 transient rate drops. Quantities are approximate. Cost of service is $29.25 for full-service and $4.75 for transient service. System requires a channel dedicated to the KAFB station and an override capability per proposed CTV plans. These CTV conduits will branch off the duct bank and stub out adjacent to all primary electrical equipment. Cable One shall install their own cable, equipment, and above ground junction boxes, and will make all associated terminations and connections. Stubbed-out conduits must be separated no more than 2" for junction box locations.

Pl.'s App. at 1. The record contains no explanation regarding why Paragraph 6.2 was amended.

---

8. Paragraph 6.2 of the Comprehensive Master Plan originally read:

   6.2 *Proposed Cable TV System*
   6.2.1 *General*
   An underground direct burial PVC conduit system will be installed to meet existing and future requirements and Cable One's requests.
   6.2.2 *Circuiting*
   Two empty 4" or 2" direct buried conduits will be installed at 18" above the top of electrical duct bank, 12" to the side of EMCS, at a minimum depth of 24" . . . for Cable One use

(station owns this equipment). Rates must be comparable to existing.

Design raceway system utilizing 1–4″ C. [Conduit] or 1–2″ C. Use 4″ C. in congested areas. Provide spare wiring space in all duct systems, either a spare conduit or innerduct.

Def.'s App. at 35–36.

On April 20, 1999, the Navy held a Pre–Proposal Conference at Keesler AFB. Def.'s App. at 20–31. In response to the questions and comments of several prospective offerors, the Navy issued three additional amendments to the Solicitation, but none addressed revised Paragraph 6.2.

*Helix's Proposal*

On June 1, 1999, Plaintiff submitted its proposal to the Navy on letterhead of "Helix Electric, Inc., Constructors Engineers." Def.'s App. at 43–211. The proposal's executive summary stated:

Helix Electric, Inc. and Boyle Engineering have specifically formed a team to take advantage of the many unique aspects of this Request for Proposal (RFP) and to meet the intent of the Military's objectives. Our specific project objectives include: Providing an excellent quality electrical distribution system that is both economical and reliable for Keesler AFB . . . .

Def.'s App. at 46. Plaintiff's proposal did not offer to provide CATV service and did not price such service for the Government or private subscribers on base. Def.'s App. at 86–95. Nothing in Plaintiff's proposal indicated that it or Boyle Engineering intended to provide CATV service to Keesler.[9] Def.'s App. at 43–211.

The section of Plaintiff's proposal addressing its past performance stated:

Helix Electric is a recognized leader in military construction. A recipient of numerous commendations, for past military and other publicly funded projects, Helix is also consistently ranked in the top 20 elec-

trical contractors nationwide by Engineering News Record, with revenues totaling $138 million for fiscal year 1998. Helix Electric, Inc. personnel have been responsible for the installation of hundreds of miles of ductbanks, over a thousand miles of medium voltage cable, and the conversion of thousands of buildings to new electrical distribution systems.

Def.'s App. at 56. The past performance section of Plaintiff's proposal did not reference any experience in providing CATV service. Def.'s App. at 48–65. Helix's proposal contained a preliminary schedule indicating the relocation of the CATV system between January 7, 2000 and May 29, 2001. Def.'s App. at 102.

The Vice President of Helix's electrical distribution group testified that Helix interpreted Amendment 2 to the Contract "to provide Helix with the option of acquiring CATV service from a source other than Cable One and distributing the CATV service to customers at the base using its own manpower, materials and equipment, in full compliance with the specified requirements." Declaration of Brian E. Jordan (Dec. 19, 2002) (Jordan Decl.) ¶ 4, Def.'s App. at 152. Helix's Vice President explained:

This would enable Helix to obtain the rights to provide service to the cable customers at the base. Helix knew that the rights to such customers were an asset that had substantial economic value. Helix had estimated that, as the provider of CATV, it would have an asset worth several million dollars. As such, Helix lowered its bid substantially, in reliance on the contract language that it could 'acquire service from another source.'[10]

Jordan Decl. ¶ 4, Def.'s App. at 152.

*Cable One's Unrelated Pre–Existing Franchise Agreement with Keesler AFB*

On October 1, 1993, the Air Force executed contract number F22600–93–D–0014, a

---

9. There is no contemporaneous evidence that at the time Plaintiff submitted its proposal, it intended to serve as "another source" of CATV service after the Contract was awarded. Nor is there any evidence that Plaintiff held any CATV franchises at the time it entered into the Con-

tract, or that it had been a CATV service provider in the past.

10. No documentation underlying Helix's bid is in the record. Nor is there any evidence of what Helix's bid had been before it was lowered sub-

non-exclusive ten-year franchise agreement with Cable One for the provision of CATV service on base. Pl.'s App. at 110–50. The agreement expired on Sept. 30, 2003, but permitted renewal. Pl.'s App. at 115–16. The agreement included a statement of work identifying, *inter alia,* channel capacity, programming, emergency override, construction requirements, technical requirements, service standards and subscriber relations, and government-furnished property and services. Pl.'s App. at 124–35. The franchise agreement included the schedule of rates Cable One was permitted to charge base residences and other facilities and listed the estimated total revenue for a 10–year period as $8,611,557.50. Pl.'s App. at 141–43.[11] This agreement could be terminated for the convenience of the Government in accordance with FAR Part 49. Pl.'s App. at 117. The agreement further stated in relevant part:

**3. Recognition of Unique Circumstances:**

. . . . .

b. The Contractor further recognizes that the changes in the activities of the Base may occur from time to time throughout the term of this Agreement and that such changes may require changes in the operation of the cable system, including, but not limited to, the removal or relocation of any of the Contractor's facilities and equipment or the removal of the entire system and termination of this Agreement. The Contractor's exclusive rights with respect to any such termination or changes that may be required by the government are set forth in this Agreement.

c. The Contractor further recognizes that the construction, installation, maintenance and operation of the cable system on the Base may be subject to requirements and approvals not normally imposed by civilian franchising authorities. The Contractor agrees to abide by all applicable

regulations and to obtain all required approvals as specified in this Agreement or as directed by the government . . . .

Pl.'s App. at 114.

On February 11, 1998, the Air Force posted a website, http://www.safaq.hq.af.mil/contracting/toolkit/catv/SECT1.html, detailing requirements for Air Force installations obtaining CATV services, including the requisites for the base access letter, license to use real property, franchise agreement, and subscription contract. Def.'s App. at 245–303; *see also* Def.'s App. at 370.

*Helix's Contract*

On July 21, 1999, Helix was awarded contract number N62467–99–C–0883 in the amount of $34,965,000.00.[12] Def.'s App. at 212–13, 216. Work was scheduled to begin on August 5, 1999, and the Contract contemplated a duration of 735 days and a completion date of July 20, 2001. Def.'s App. at 216–17. The payment terms of Helix's contract did not include any provision for payment of cable TV services fees to Helix by appropriated fund entities, NAFIs, or subscribers on base.

The Contract incorporated FAR 52.236–7, Permits and Responsibilities, which provided: "The contractor shall without additional expense to the Government, be responsible for obtaining any necessary licenses and permits and for complying with any Federal, State and municipal laws, codes and regulations applicable to the performance." Contract Document 00721 ¶ 1.30.

*The Partnering Session and Subsequent Discussions*

On August 19, 1999, the Navy, Air Force, Plaintiff, and Boyle held a partnering session, during which Plaintiff's president, Gary Shekhter, first informed the Navy of Plaintiff's intent to "acquire [CATV] service from another source" by using its own resources to provide CATV service instead of Cable One.[13] Specifically, under Plaintiff's interpre-

---

stantially based on the amendment to Section 6.2.

**11.** The Government was not liable for CATV fees for services provided to individuals and nonappropriated fund activities. Pl.'s App. at 120.

**12.** Due to changes not at issue here, the Contract price was revised to $38,162,430.00. Compl. ¶ 5.

**13.** In a June 6, 2001 claim letter to the Navy, Plaintiff admitted that the August 19, 1999 partnering session was the first time it raised the prospect of becoming a CATV provider. Pl.'s App. at 99. There is no evidence that Plaintiff

tation, the Contract: 1) purported to confer contracting authority for a government acquisition of CATV services on a private contractor; 2) permitted Helix to engage in anticompetitive self-dealing by awarding a CATV contract to itself; 3) gave rise to a potential organizational conflict of interest by having Helix both submit a proposal for such services and award a resultant contract to itself; 4) called into question the Air Force's exclusive role in awarding a CATV franchise on base and granting related base access, licensing, and subscription agreements; and 5) purported to authorize the government's acquisition of CATV services without properly obligated funds. Pl.'s App. at 99; Def.'s App. at 223–28; Compl. ¶ 9. At the same time, Plaintiff requested a copy of Cable One's franchise agreement with the Air Force, and the Navy provided this agreement to Plaintiff in early September, 1999. Jordan Decl. ¶ 6, Pl.'s App. at 153.

On September 30, 1999, the Navy issued Modification P00002, extending the completion date for 180 days to January 16, 2002. Def.'s App. at 240–42. Plaintiff's Vice President testified that Helix estimated that it would require a total of at least 247 days to design the CATV systems, obtain the government's approval of the design, and install a system. Jordan Decl. ¶ 9, Pl.'s App. 155.

Plaintiff's assertion of its intention to be the CATV service provider at Keesler AFB triggered a series of e-mail messages between the Air Force, Navy, Plaintiff, and Cable One in August and September of 1999. Pl.'s App. at 4–14. These e-mails reflected questions on the part of Air Force and Navy personnel regarding whether Helix was required "to sub the [CATV] work out to Cable One" or whether Helix or some other source would be able to provide this service. Pl.'s App. at 4–14. Air Force personnel voiced concern with the prospect of bringing in a

new CATV service provider, noting that Cable One had a franchise agreement with the Air Force through FY 2003 and there would be costs associated with terminating that agreement and installing a new system, and uncertainty with maintenance of a new system. Pl.'s App. at 7–9.

In order to address these issues, a meeting was held on October 5, 1999, during which representatives from the Navy, Air Force, and Plaintiff discussed Plaintiff's plans to acquire CATV services. *See* Pl.'s App. at 14; *see also* Def.'s App. at 244. Following this meeting, Ms. Laurie Watts, the Navy's project manager, requested that Helix submit a technical proposal for relocating the existing CATV system and a cost proposal for deleting the provision enabling Helix to "acquire service from another source." Pl.'s App. at 14. By letter dated October 13, 1999, she stated:

> Thank you for taking the time to present to us Helix Electric's approach and philosophy to the relocation of the CATV system currently in place at KAFB. Because this system was not included in the recent design submittal,[14] please formalize the above presentation in a technical proposal, outlining construction and operation of the relocated system.
>
> Additionally please provide a cost proposal for deleting the provision to provide CATV service from the contract. Delete "... or acquire service from another source ..." from paragraph 6.n of the Project Statements in Part 6 of the RFP. You will still be required to coordinate design and construction of the relocation of the existing system as outlined in paragraph 6.2 of the SSR study.[15] Please prepare a change order cost proposal on Change Order Estimate Form (NAVFAC 4330/30). Please

---

attempted to acquire service from a CATV service provider other than itself.

**14.** Solicitation Document 00911, entitled "Design Requirements" set forth the post-award requirements for design submittals. Contract Document 00911 ¶ 1.1. Document 00911 required that all designs be submitted by means of a formalized technical proposal. Document 00911 ¶¶ 1.10–1.13.

**15.** In May of 1998, SSR Engineers, Inc. prepared the "Comprehensive Master Plan for Installing the Base Primary Distribution System Underground," which formed the basis of, and was incorporated into, the Solicitation, as amended.

forward the proposal to this office not later than Friday, October 22, 1999.

Please note that this letter is not a change order or notice to proceed with any work resulting in a change to the Government. The work can only be incorporated into the contract by a Modification of Contract (Standard Form 30).

Pl.'s App. at 15.

On October 27, 1999, Plaintiff submitted the requested proposal to the Navy. Pl.'s App. at 16–27. The proposal consisted of a technical description of the cable system Plaintiff intended to provide for Keesler AFB and a cost proposal for deleting the paragraph concerning the provision of CATV service from the contract. The cost proposal stated in relevant part:

As to the cost impact for the deletion of ["... or acquire service from another source ...", this issue should be divided into two items:

1) The impact to Helix Electric due to the loss of ownership and operation of the cable system.

2) The costs associated with the utilization of Cable One to relocate the existing CATV system.

Item Number One:

As indicated in the information provided to Navy and Air Force personnel on October 5, 1999, the market value of the relocated CATV system when completed will be somewhere between $2,921,009. to $4,590,157. (line six of the 10/5 document). For the sake of this proposal, Helix is placing the current market value of this system at the middle of this value range, or $3,775,583. Helix Electric believes that this is at the lower range of the system's actual value since the relocated system will be a high-end, 750MHz, internet-ready system.

Taking into consideration the risk of building and operating this system, Helix Electric is at this time willing to accept 70% of the estimated value of this system, or $2,642,908, as compensation for the loss of rights of ownership and operation of the system.

Item Number Two:

Cable One's price at proposal time [to relocate the existing CATV system] was $1,501,165. Should the Navy wish to issue a lump sum change order, at this time for Cable One's involvement the price will be $784,186, (HEI CE # 002) as indicated in the attached form 4330/30. However, Helix Electric believes that it would be in the interest of the project to address this issue using the same approach as with Bell South; issue a not-to-exceed change order of $156,959 (HEI CE # 002A). This will cover Helix's supervision costs of Cable One, and Cable One's costs, up to $961,288. Another modification could be issued if additional funds were needed due to increased Cable One costs.

Pl.'s App. at 16–17.

By letter dated November 18, 1999, Ms. Watts, the Navy's project manager, rejected Plaintiff's proposal and directed Plaintiff to coordinate with Cable One, stating:

[T]he Air Force has stated that Keesler Air Force Base's rights and the rights of the existing CATV provider, Cable One, cannot be abridged by this project. Acquisition of CATV services from another provider is not a viable alternative in this contract. As you know, CATV franchise holders must obtain a Franchise Agreement, a Base Access Letter, and a License to use Real Property from the Air Force before they can serve on base. No other CATV provider, including Helix Electric, has this authorization from Keesler Air Force Base. Therefore your obligation under this contract must be to coordinate with Cable One for the design and construction of the new system. Initially, all coordination with Cable One must be facilitated by this office.

You shall proceed with the design of the relocation of Cable One's CATV system as required by the contract. Your design shall meet or exceed industry standard and Cable One's operating requirements. All CATV design is subject to review and approval by the government and its current CATV provider. If the new system follows the main ductbank routing already established, the design of this system will not impact that portion of construction.

Pl.'s App. at 28. On November 23, 1999, Plaintiff responded stating, "Helix Electric considers this direction [to proceed with Cable One] to be a constructive change to the contract and is proceeding under protest." Pl.'s App. at 29. Helix reiterated its belief that the RFP clearly gave it the option "to construct, own, and operate the CATV system," and requested a dispute resolution meeting on this issue. Pl.'s App. at 29–30. The Navy did not respond to this letter. By letter dated February 16, 2000, Plaintiff again requested a dispute resolution meeting. Pl.'s App. at 31.

By letter dated March 7, 2000, Darryl W. Hawkins, the Navy's contracting officer, responded to Plaintiff's letters stating:

To become a system provider one must seek all permits, licenses, and/or franchise agreements to do so as stated in Federal Acquisition Regulation 52.236–7, Permits and Responsibilities.[16] The letter of 18 November 1999 signed by Laurie Watts was for the purpose of giving you information the Project Manager had received after conversation with the Air Force regarding your inquiries. This was not an attempt to change the Contract since a contracting officer can make only contract changes [sic]. The Contract stands as written. It is your decision on how to fulfill the requirements of the Contract by the alternative you choose. It is a fact that you must obtain Air Force authorization to operate CATV system at Keesler Air Base. It is also a fact that Cable One is currently the only franchise holder for the base. Obtaining the required authorization is action you have the option to pursue.

You are directed to proceed in accordance with the terms of the contract.

Pl.'s App. at 32.

Viewing this letter as a reversal of the Navy's earlier position directing it to use Cable One, Plaintiff sought guidance from the Navy on how to proceed to obtain a franchise agreement. Jordan Decl. ¶ 6, Pl.'s App. at 153.[17] On July 27, 2000, some three months later, Ms. Watts, the Navy's project manager sent the following e-mail to Plaintiff:

[I]f you want to proceed with the request to provide CATV service to KAFB [Keesler], you need to submit an unsolicited proposal to KAFB. Submit it to this office. We will forward that to the Air Force Contracts office, who will coordinate the review of the proposal.

Pl.'s App. at 34; *see also* Jordan Decl. ¶ 6, Pl.'s App. at 153.

Plaintiff replied to this e-mail by letter on August 15, 2000, stating:

Helix Electric does intend to provide CATV services to Keesler Air Force Base (KAFB) as provided in the Contract Documents; however, we do not agree that the Contract Documents require Helix Electric to submit an "unsolicited proposal" to KAFB in order to exercise the option to provide this CATV service.

Helix Electric will proceed, as directed, to provide an unsolicited proposal; however, Helix is proceeding under protest and views this direction as a Constructive Change to the Contract. Due to the magnitude of this issue, it is requested that the Contracting Officer for this project confirm this direction. It is also requested that this confirmation take place immediately. The last time a Request for Contracting Officer confirmation was made by Helix regarding this issue, the Contracting Officer response took 105 days (November 23, 1999 to March 7, 2000), severely impacting Helix Electric, and forcing Helix to take actions that would not have been taken had Mr. Hawkins provided a timely response.

---

16. FAR, 52.236–7, Permits and Responsibilities, states in pertinent part: "The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes and regulations applicable to the performance of the work." Pl.'s App. at 33.

17. Meanwhile, on March 20, 2000, Plaintiff received a partial release to begin construction on a portion of phase A of the project. Pl.'s App. at 101.

In the interest of providing this unsolicited proposal in a format acceptable to KAFB [Keesler AFB], it is requested that Helix be provided with information relative to the desired format and a description of the information requested therein. Upon receipt of this information, Helix Electric will then complete the proposal and forward it to the Navy as indicated in the subject e-mail.

Pl.'s App. at 35–36.

By letter dated August 31, 2000, Mr. Hawkins, the Navy's contracting officer advised Plaintiff:

In regards to our discussions of 31 August 2000, in the office of Jim Hamrick with Brian Jordan and myself present, it is agreed that Helix will submit to [the Navy's] Field Office Gulf Coast their [sic] proposal for supplying cable TV service to Keesler AFB. Field Office Gulf Coast will attempt to facilitate a meeting between Helix, ROICC, and Keesler AFB key personnel to determine the desired format and content of the proposal. This letter does not constitute any agreement that permits Helix to provide such service, it only serves as direction as to where the proposal should be directed.

Pl.'s App. at 37.

In late October 2000, the Navy informed Plaintiff that the unsolicited proposal should follow the requirements of FAR 15.605, "Content of Unsolicited Proposals." Jordan Decl. ¶ 6, Pl.'s App. at 153–54.

On November 30, 2000, Plaintiff submitted its unsolicited proposal to the Navy. Pl.'s App. at 38–76. This proposal identified Plaintiff as a "For–Profit Cable TV Provider," and set forth a basic description of the CATV service Plaintiff proposed to provide,[18] and identified two CATV consultants Plaintiff intended to use as operations managers for the project. Pl.'s App. at 34, 43, 45–47. The proposal further provided that Plaintiff's franchise to provide CATV service would run for a period of ten years and included a proposed channel lineup and schedule of fees,

which were comparable to those of the existing provider, Cable One, as well as a detailed list of expenses. Pl.'s App. at 53–77.

By letter dated December 14, 2000, the Navy's contracting officer notified Plaintiff that the Navy was returning Plaintiff's unsolicited proposal, stating:

I have been advised by our legal staff that your unsolicited proposal for providing CATV services to Keesler AFB should be forward ·(sic) directly to the Keesler AFB contracting office. In that this matter deals with an unsolicited proposal outside of our contract with Helix and is one that proposes a new service to Keesler AFB, I would be operating outside my authority to even accept such a proposal for review.

Pl.'s App. at 77. The CO further directed Helix to submit the unsolicited proposal to Mr. Tullos, the Air Force's contracting officer at Keesler AFB. Pl.'s App. at 77; *see also* Def.'s App. at 244.

On January 2, 2001, Helix responded to the Navy's December 14 letter:

[I]t is very puzzling to receive this current letter whereby you are now ordering Helix to submit this proposal directly to Keesler AFB, an entity to which Helix has no contractual relationship.

It remains the position of Helix Electric that there is no contract requirement for Helix to provide this unsolicited proposal in the first place and that Helix is allowed by the contract to provide CATV "service from another source". This continues to be Helix's intent. It is Helix Electric's expectation that the Navy will promptly take whatever steps are necessary to ensure that Helix Electric becomes the Franchise holder for these services at Keesler AFB and is thereby entitled to obtain the benefits of its contract with the Navy.

Pl.'s App. at 78. Nevertheless, Plaintiff submitted the unsolicited proposal to the Air Force contracting officer on the same day. Pl.'s App. at 80.

---

**18.** The proposal stated that the system would provide seventy-eight analog television channels, high-speed internet access, an unspecified number of digital television channels, a Government Access Channel, and an emergency override system to allow the Government to transmit messages on all channels. Pl.'s App. at 45.

The Air Force communications squadron and contracting staff at Keesler AFB met on February 15, 2001, and March 21, 2001, to evaluate Plaintiff's proposal. Def.'s App. at 305, 308–09. During this meeting the following "concerns" were voiced by Air Force personnel:

(1) Can we have two cable companies providing the Government access channel and two cable companies operating the cable override system? (2) Is Helix serious about providing the investment required for the infrastructure of the cable system on base? MSgt Sargent Sanders estimates that the current cable franchise has an investment of between 35 & 40 million in infrastructure, & (3) If another CATV franchise is granted, is there physically enough real property space available on Keesler AFB to allow placement of equipment? MSgt Sargent Sanders does feel we need to evaluate exactly what Helix Electric Inc. has to offer, and that the competition between two cable providers would benefit Keesler AFB.

Def.'s App. at 305.

By letter dated April 26, 2001, the Air Force's contracting officer at Keesler AFB informed Plaintiff that the Air Force could not fully review Plaintiff's proposal "due to the lack of pertinent information in [Helix's] proposal." Pl.'s App. at 82. Specifically, the Air Force requested technical details of "how, when & where Helix intends to install it's [sic] own cable infrastructure on Keesler AFB MS, and . . . what areas of the base you intend to provide CATV service to." Pl.'s App. at 82. The letter also requested that Plaintiff indicate whether it wanted the "government to provide shop/office space under this proposal," informed Plaintiff that new Air Force policy limited the length of franchise agreements to five years, and referred Plaintiff to the Air Force website on requirements for applications for CATV franchises and provided excerpts from the site. Pl.'s App. at 82.

Plaintiff determined that it could not gain approval to provide CATV service on Keesler AFB in time to install its system before the completion date of the Contract, and thus, never submitted the additional information requested by the Air Force's April 26, 2001 letter. Jordan Decl. ¶ 8–11, Pl.'s App. at 154–55; Def.'s App. at 363.[19]

On February 11, 2002, after completing the new electrical distribution system at Keesler AFB, Plaintiff submitted a claim to the Navy's contracting officer for $7.2 million, Plaintiff's estimate of the value of a CATV franchise.[20] Pl.'s App. at 105–06. Plaintiff contended that the Navy prevented Helix from obtaining the benefits of owning and operating a CATV system on Keesler AFB and delayed and prevented Plaintiff from executing a franchise agreement before the end of the Contract term. Pl.'s App. at 105–06.

On April 3, 2002, the Navy's contracting officer issued a final decision denying Plaintiff's claim in its entirety on the basis that: (1) the contract for the re-design of the base's electrical distribution system did not give Plaintiff a right to become the CATV service provider for the base; and (2) Plaintiff failed to obtain the necessary licenses and permits from the Air Force to become the CATV service provider at Keesler AFB. Pl.'s App. at 107–09.

### Discussion
#### Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). A fact is material

---

**19.** There is nothing in the record indicating contemporaneously that Helix had the financial wherewithal to obtain the costly infrastructure for its own system. There is nothing in the record to indicate that the Navy or Air Force ever terminated Cable One's franchise agreement for convenience.

**20.** The basis for this valuation was Plaintiff's contention that such a CATV franchise would serve 2,250 full-rate customers who would pay $3,000.00 for CATV service and 2,000 transient-rate customers who would each pay an average of $486.00 for CATV service. Pl.'s App. at 106.

if it may affect the outcome of the suit. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party bears the initial burden of proof and may discharge its burden by demonstrating an absence of evidence to support the opposing party's case. *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. *Mingus,* 812 F.2d 1387, 1390–91. Denial of both motions is warranted if genuine disputes exist over material facts. *Id.* at 1391.

*Plaintiff's Interpretation of the Contract Gave Rise to a Patent Ambiguity*

*Section 6.2 Altered and Exceeded the Scope of the Contract.*

In construing a contract, a court must begin with plain language. *M.A. Mortenson Co. v. Brownlee,* 363 F.3d 1203, 1206 (Fed. Cir.2004). The court "must construe the contract 'to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" *Id.* (citing *Hercules, Inc. v. United States,* 292 F.3d 1378, 1381 (Fed.Cir. 2002)). Here, the language in Section 6.2 authorizing the contractor to "acquire [CATV] service from another source" is inconsistent with the overall scope of the Contract, which was limited to the relocation of the electrical system at Keesler, thus creating an ambiguity.

In *HPI/GSA–3C, LLC v. Perry,* 364 F.3d 1327, 1334 (Fed.Cir.2004), the United States Court of Appeals for the Federal Circuit recently articulated the ground rules for construing an ambiguous contract:

Our precedent provides us with several legal rules for choosing between competing interpretations of an ambiguous contract provision. The general rule is *contra proferentem,* which requires ambiguities in a

document to be resolved against the drafter. *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992). The patent ambiguity doctrine, however, is an exception to the general rule that requires construing ambiguities against the contractor where the ambiguities are "so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them." *Triax Pac. v. West,* 130 F.3d 1469, 1474–75 (Fed.Cir.1997) (quoting *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963)).

Helix's interpretation that Section 6.2 empowered it to become the CATV service provider gives rise to a glaring ambiguity calling into question the fundamental nature and scope of the services being procured under the Contract. Plaintiff's provision of CATV services would change the basic tenor of the Contract and expand it into an arena otherwise unmentioned in the Solicitation. Helix would go from providing construction services—moving electrical lines underground— to becoming a CATV operator, franchisee, and content provider that sells subscriptions and maintains a CATV system for personnel on base.

The Solicitation did not mention the provision of CATV services as part of the scope of this contract, describing the work as follows:

This RFP is for the design and construction to change the base and family housing electrical overhead systems to underground systems for a cost ranging from $34,000,000 to $37, 500,000.00.... The overhead system distributes several communications systems that are a combination of station owned[21] and non-station owned systems and a street/area lighting system. This project is to provide a new base main switching/sub station, new underground power circuits including transformers and secondary conductors, and a replacement of the station owned communication systems. The contractor will be responsible for coordinating and providing facilities to allow for the relocation of communication systems that are not sta-

---

**21.** "Station-owned" is defined as Keesler AFB-owned equipment. Pre-proposal Conference

Meeting Minutes, Def.'s App. at 20–31.

tion owned. This will require extensive coordination with communication utility companies. Also, a new base-wide street/area lighting system is to be provided. The contractor will be responsible for coordinating the entire project. Once the underground system is operational the overhead system is to be removed in its entirety. The project will require medium voltage live-line work, substation design/construction, medium voltage distribution design/construction, significant construction/outage phasing, outdoor lighting design/construction, communications systems design/construction, etc. This base must stay in operation for the entire duration of this project.

Def.'s App. at 9.[22] Prior to the Amendment, which injected the language in controversy here, Section 6.2 addressed only the relocation and construction of the existing CATV system, stating that Cable One would install its own cable, equipment, and junction boxes as follows:

### 6.2 *Proposed Cable TV System*

#### 6.2.1 *General*

An underground direct buried PVC conduit system will be installed to meet existing and future system requirements and Cable One's requests.

#### 6.2.2 *Circuiting*

Two empty 4″ or 2″ direct buried conduits will be installed at 18″ above the top of electrical duct bank, 12″ to the side of EMCS, at a minimum depth of 24″ (Re: Volume III, Construction Standards, Unit Drawing UR2–N) for Cable One use per proposed CTV plans. These CTV conduits will branch off the duct bank and stub out adjacent to all primary electrical equipment. Cable One shall install their [sic] own cable, equipment, and above ground junction boxes, and will make all associated terminations and connections. Stubbed-

out conduits must be separated not more than 2″ from junction box locations.

Pl.'s App. at 1.

Amendment 2 purported to alter radically the requirements of this Section from installation of cable conduit and junction boxes, to authorizing acquisition of CATV service from "another source" for 2000 base residents, addressing rates, channel capacity, and overrides in place of conduit construction and circuiting. The revised language stated:

n. Reference Page 61, paragraph 6.2. Existing system is owned by Cable One. The Contractor must pay Cable One to relocate their [sic] system [23] or acquire service from another source. Requirements are for service to residential areas with 2000 dwelling units (subscription to service is an occupant decision), 250 full rate drops and 2000 transient rate drops. Quantities are approximate. Cost of service is $29.25 for full-service and $4.75 for transient service. System requires a channel dedicated to the KAFB station and an override capability (station owns this equipment). Rates must be comparable to existing.

Design raceway system utilizing 1–4″ C. or 1–2″C. Use 4″ C. in congested areas. Provide spare wiring space in all duct systems, either a spare conduit or innerduct.

Def.'s App. at 35–36.

No other portion of the Solicitation, including the Technical Requirements, evaluation factors, or pricing, was amended to authorize provision of CATV services. As such, the revision in Amendment 2 created a patent ambiguity in the Contract.

*Section 6.2 Was Inconsistent With Statutory and Regulatory Requirements For Awarding CATV Contracts On Air Force Bases.*

Helix's interpretation that Section 6.2 gave it a guaranteed option to become a CATV provider on base, raised a conflict with the detailed statutory and regulatory process embodied in the Cable Competition Act and a

---

22. Even the title of the Contract was limited to "Changes to the Underground Electrical Distribution System."

23. Paying Cable One to relocate its system was consistent with the overall concept in this pro-

curement that the contractor would "be responsible for coordinating and providing facilities to allow for the relocation of communication systems that are not station-owned." Section 00202 ¶ 1.3, Def's.App. at 9.

mandatory Air Force Instruction governing acquisition of CATV services. Applicable statutes and regulations are a part of the contemporaneous circumstances of the contract's execution and are incorporated, without reference, into the agreement itself. *Dart Advantage Warehousing, Inc. v. United States,* 52 Fed.Cl. 694, 700 (2002) (citing *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,* 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991)) (stating, "[l]aws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms"). It is presumed that parties contract with knowledge of the law and are aware of applicable statutes and regulations when entering into the contract. *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

There are four requirements imposed by law in order for an entity to become a CATV provider: (1) a franchise agreement; (2) a base access letter from the base commander; (3) a license to use real property from the base commander; and (4) a subscription agreement with the base contracting officer.

The Cable Competition Act, 47 U.S.C. § 541(b)(1), provides that a prospective CATV service provider for a United States Air Force base "may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1) (1999); *see also Cox Cable Commc'ns, Inc. v. United States,* 992 F.2d 1178, 1181 (11th Cir.1993) (stating provider may not provide CATV service on an Air Force base unless awarded a franchise by the Air Force which is the "franchise authority" for its bases); Air Force Instruction (AFI) 64–101, "Cable Television Systems on Air Force Bases," (1994) at 4 § 2.1 ("Private CATV operators must obtain a nonexclusive franchise in accordance with this instruction before offering on-base services."). The authority to grant a franchise rests exclusively with the support group commander in charge of base facilities. AFI 64–101, at 2 § 1.1

The Base Contracting Officer (BCO) "must award new CATV franchises competitively." AFI 64–101, at 4 § 2.2. AFI 64–101 provides:

2.2.1 Contracting officers make every reasonable effort to solicit offers from all potential CATV operators. Annexation of part or all of the base by a nearby community does not limit the base to a CATV operator franchised by the community.

*Id.* at 4 ¶ 2.2.

A base access letter is also required for a CATV franchisee to enter the base to solicit private commercial subscriptions from private entities. Def.'s App. at 245. Such an access letter may be granted by the base commander pursuant to the Internal Security Act of 1950, 50 U.S.C. § 797. A prospective CATV operator must also obtain a license to use real property to construct, operate, and maintain on-base facilities. This license is issued by the base commander, acting through the base civil engineer, not the base contracting officer. AFI 64–101, at 9 § 5.2.

Finally, in order for an appropriated fund activity or a non-appropriated fund activity to obtain CATV service, a subscription agreement has to be negotiated separately from the franchise agreement. AFI 64–101 at 6, §§ 3.1.1–.1.3 ("Franchise agreements and CATV contracts are different instruments; contracting officers must not combine them. . . . If more than one CATV operator is franchised to provide service to the base, contracting officers use normal competitive procedures and must acquire CATV services by bilateral written contract.")

The contract provision that would enable a contractor to "acquire" services, which were subject to independent regulatory requirements, without referencing those regulatory requirements or incorporating them into the work schedule also raised a glaring ambiguity which should have prompted Helix to seek clarification prior to bidding.

*Section 6.2's Authorization of A Private Contractor to Acquire CATV Services From Itself Should Have Raised Questions About the Legality of this Provision.*

The purported grant of authority to a private contractor to award a CATV franchise for an Air Force base to itself should have sounded an alarm to a reasonable contractor about the legality of such a provision. Under FAR 1.602, a contracting officer's contracting

authority cannot be extended beyond express written limitations imposed by statute, regulation, or the contracting officer's delegating authority. 48 C.F.R. § 1.602.1. Here, as described above, Air Force regulations expressly limit the authority to award CATV franchises and service contracts on Air Force bases to specific Air Force personnel.

Interpreting Section 6.2 as Plaintiff suggests could place a contractor in the position of soliciting and awarding a contract for the provision of CATV services on Keesler AFB to itself, permitting anti-competitive self-dealing prohibited by federal procurement law and the Air Force rules on awarding CATV franchises and contracts. Specifically, Plaintiff's interpretation could give rise to a potential organizational conflict of interest (OCI). 41 U.S.C. § 253; 10 U.S.C. § 2304(A); FAR 9.505, 9.508 (1999); 48 C.F.R. § 9.505–3 (1999); *Vantage Assocs., Inc. v. United States,* 59 Fed.Cl. 1, 10 (2003) (an OCI exists "when the contractor's objectivity may be impaired due to the nature of the work to be performed" and includes situations in which a government contract could entail a firm evaluating itself without proper safeguards); *accord, Filtration Dev. Co. v. United States,* 60 Fed.Cl. 371, 379 (2004) (Because "Westar was improperly 'in a position to make decisions favoring its own product capabilities,'" it occupied an impermissible dual role, and an actual OCI arose).[24] Further, the authorization of a contractor acquiring such services from itself should have raised questions about lack of competition. *See* AFI 64–101 at 4 § 2.2, (requiring

Air Force CO to award new CATV contracts competitively).[25]

*The Patent Ambiguity in the Contract Required Helix to Inquire Before Bidding*

As a seasoned and knowledgeable bidder,[26] Helix should have recognized that its interpretation of Section 6.2 was inconsistent with the scope of the Contract, the statutory and regulatory process for becoming a CATV operator on an Air Force base and raised serious issues about the legality of Helix acquiring these services from itself.[27] In *Dalton v. Cessna Co.,* 98 F.3d 1298, 1305–06 (1996), the Federal Circuit took the bidder's business acumen into account in imposing a duty to inquire and stated:

> [W]e view Cessna as a knowledgeable bidder. Cessna should have recognized that its construction of the Contract ... was squarely in conflict with the construction of the Contract that reasonably flowed from the basic nature of the contract (firm fixed-price) and its provisions. This patent ambiguity created an obligation on Cessna's part to seek clarification before submitting its proposal.

Similarly, the patent ambiguity here created an obligation on Helix's part to seek clarification before submitting its proposal. *See United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 738 (Fed.Cir.1997) (Because United's interpretation of experience requirements conflicted with the scope of work, it was required to seek clarification before bidding; because it failed to do so, it is not entitled to rely upon its construction of the contract); *see also Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.

---

**24.** The Court does determine whether an OCI arose here, but merely points out that because Plaintiff's interpretation raised the issue of a potential OCI, this was yet another factor which behooved Plaintiff to seek clarification of its interpretation prior to bidding.

**25.** Section 6.2 purported to authorize the acquisition of CATV services without funding obligated for this purpose. 31 U.S.C. § 1301(a) provides that "Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). The FY99 Omnibus Appropriations Bill authorized funds for repairs to Keesler AFB for damage caused by Hurricane Georges. Def.'s App. at 382–86. Nothing in the bill au-

thorized the use of funds to pay for obtaining the services of a CATV provider, giving rise to further questions about the legality of this provision.

**26.** According to its proposal, Helix is a recognized leader in military construction, consistently ranked as one of the top 20 electrical contractors nationwide in *Engineering News Record. See* Def.'s App. at 48–65.

**27.** Plaintiff's interpretation also raised the practical question of what would become of Cable One's existing franchise, which was not due to expire until some four years later, in particular, how this existing franchise and infrastructure would coexist with the potential new source in the physical space available on base.

1996); *accord Smith v. United States*, 49 Fed.Cl. 443, 452 (2001) (demolition contractor was obligated to inquire about "the full scope of its responsibilities" under contract.); *see also Triax*, 130 F.3d at 1475 (1997) (Patently ambiguous contract construed against contractor who failed to inquire prior to bidding); *Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647 (1982) (Contractor had duty to inquire where contract contained erroneous clause); *Nielsen–Dillingham Bldrs. v. United States*, 43 Fed.Cl. 5 (1999) (recognizing that a conflict between RFP provisions and electrical narrative regarding whether scope of work included telephone cabling gave rise to patent ambiguity).

Even if the court were to find the ambiguity to be latent, Helix's claim would fail. *See P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1355–56 (Fed.Cir.2002). "This is so because [a] contractor's interpretation of a latent ambiguity will only be adopted if it is found to be reasonable." *Id.* (internal citations omitted). Helix's interpretation here was not reasonable in light of Section 6.2's alteration of the scope of the Contract and inconsistency with the Solicitation, regulatory requirements governing CATV franchises and contracts on Air Force bases, as well as the questionable legality of the authorization to acquire CATV services from itself.[28] In sum, Helix's interpretation of Section 6.2 to allow it to acquire CATV service from itself is untenable and cannot form the basis for the relief it seeks here.

**28.** Further, in order for a contractor to recover based on an ambiguous contract provision, the contractor must demonstrate that it relied on its interpretation of this provision when preparing its bid. *E.g., P.R. Burke*, 277 F.3d at 1356, n. 3 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986)). Here, although the vice president of Plaintiff's electrical distribution group testified in a declaration that Plaintiff's bid price was based upon its reading of the contract entitling it to become a CATV service provider, Helix has provided no contemporaneous documentation to support this assertion. *See* Def.'s App. at 152. Nothing in its proposal indicated that at the time it submitted its bid it intended to become a CATV provider; its bid work sheets showing the derivation of its bid are not in the record, and there were no other contemporaneous indicia that Plaintiff expected to become a CATV services provider at Keesler AFB at the time it submitted its proposal.

*The Navy Did Not Breach Its Implied Duty of Good Faith and Fair Dealing*

Plaintiff contends that Defendant breached its implied duties of good faith and fair dealing by impeding its efforts to become a CATV operator on Keesler AFB, a right it claimed derived from the Contract. Specifically, Plaintiff alleges that the Navy breached the implied covenants to cooperate and not hinder performance by requiring it to obtain a franchise and failing to respond to its requests for dispute resolution, issuing conflicting and erroneous directions on the CATV franchise application process, reversing its position on whether Helix could become a CATV provider, and delaying and ultimately preventing Plaintiff from obtaining a CATV contract on Keesler AFB.[29]

The duties of good faith and fair dealing impose an implied obligation "that neither party will do anything that will hinder or delay the other party in performance of the contract." *Essex Electro Eng'rs v. Danzig*, 224 F.3d 1283, 1291 (Fed.Cir.2000)(quoting *Luria Bros. v. United States*, 177 Ct.Cl. 676, 369 F.2d 701, 708 (1966)). "Such covenants require each party 'not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *H & S Mfg., Inc. v. United States*, 66 Fed.Cl. 301, 310 (2005)(quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed.Cir.2005)). The duty not to hinder

**29.** Plaintiff cited the following conduct by the Navy to support its claim: 1) the Navy project manager's November 18, 1999 directive that Plaintiff contract with Cable One for CATV service; 2) the Navy project manager's repeated delay in coordinating a dispute resolution meeting; 3) the Navy contracting officer's letter of March 7, 2000, stating that Plaintiff could fulfill the requirements by the alternative Plaintiff chose; 4) the Navy project manager's July 27, 2000 e-mail to Plaintiff calling for the submission of an unsolicited proposal to the Air Force through the Navy; 5) the Navy contracting officer's letter of August 21, 2000, confirming the July 27, 2000 e-mail and stating that Keesler Gulf Coast Officer would attempt to facilitate a meeting regarding the desired format of the proposal; and 6) the Navy contracting officer's December 14, 2000, refusal to accept Plaintiff's unsolicited proposal on behalf of the Air Force. Pl.'s App. at 99–104.

is breached when a party engages in "actions that unreasonably cause delay or hindrance to contract performance." *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1542 (Fed.Cir.1993). These duties apply equally to both the government and private parties. *Centex,* 395 F.3d at 1304; *H & S,* 66 Fed.Cl. at 310; *Tecom, Inc. v. United States,* 66 Fed.Cl. 736, 762–63 (2005).[30]

It is well settled that the parties' duty of good faith and fair dealing must be rooted in promises set forth in the contract. As the Federal Circuit has noted, "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and cannot be extended to create new obligations not contemplated in the contract." *Bradley v. Chiron Corp.,* 136 F.3d 1317, 1326 (Fed.Cir.1998); *see also United States v. Basin Electric Power Co-op.,* 248 F.3d 781, 796 (8th Cir.2001), *cert. denied, United States ex rel. Norbeck v. Basin Electric Co-op,* 534 U.S. 1115, 122 S.Ct. 924, 151 L.Ed.2d 887 (2002) ("Courts must be careful when considering good faith … as it does not imply 'an ever flowing cornucopia of wished-for legal duties.' ")(quoting *Comprehensive Care Corp. v. RehabCare Corp.,* 98 F.3d 1063, 1066 (8th Cir.1996)). The implied duty of good faith and fair dealing cannot "form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement." *Jarvis v. United States,* 43 Fed.Cl. 529, 534 (1999); *see also Solar Turbines, Inc. v. United States,* 26 Cl.Ct. 1249, 1274 (1992), *aff'd,* 114 F.3d 1206 (Fed.Cir. 1997). Here, Helix's reading of the Contract as entitling it to become a CATV operator on Keesler AFB would import a wholly new contract term into its construction contract and grant it rights inconsistent with both the scope of the Contract itself and the law governing CATV franchises on Air Force bases and fundamental federal procurement principles.

The parties' duties to cooperate and not hinder performance were limited to their agreement that Helix was to relocate the existing above-ground electrical systems to underground. There was no implied duty that the Navy cooperate with Helix's endeavor to become a CATV provider. Rather, an entity's ability to become a CATV service provider on an Air Force base derives from compliance with statutory and regulatory prerequisites as determined by cognizant Air Force officials.[31]

"Good faith performance … of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 (1981); *see also Barseback Kraft AB v. United States,* 36 Fed.Cl. 691, 705 (1996), *aff'd,* 121 F.3d 1475 (Fed.Cir.1997). The "justified expectations" are those that objectively flow directly from the terms of the contract and "must attach to a specific substantive obligation, mutually assented to by the parties." *State of Alaska v. United States,* 35 Fed.Cl. 685, 704 (1996), *aff'd,* 119 F.3d 16 (Fed.Cir. 1997), *cert. denied,* 522 U.S. 1108, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998). Plaintiff's claimed expectations of becoming a cable TV franchisee and earning some $7 million in profit under its contract to relocate electrical wiring were not reasonable. Nor was Plaintiff's asserted expectation to become a cable TV provider—when it never offered to do so in its proposal—reasonable.[32]

---

**30.** As the *Tecom* court aptly recognized: "[W]hen the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application." 66 Fed.Cl. at 769 (citing *Moore v. U.S.,* 46 Ct.Cl. 139, 172–74, 1910 WL 921). The *Tecom* court further noted that "[t]he presumption of good faith conduct of government officials has no relevance" in a court's consideration of claims that the duties to cooperate and not hinder performance have been breached. *Id.* at 771.

**31.** These requirements, in addition to being published in statute and regulation, were posted on a web site, along with model agreements and instructions. As such, the process for becoming a CATV provider on an Air Force base was readily available to any interested entity and did not require the assistance of the Navy.

**32.** Plaintiff's offer made no mention of Helix providing CATV service itself, gave no indication it had any past performance experience as a CATV provider and did not include either a technical or cost proposal to provide CATV service. Indeed, Helix did not alert the Government that

The Court recognizes that the Navy's actions may have sent the wrong signals to Helix, but this in no way entitles Helix to recovery. Specifically, the Navy fostered Helix's unreasonable expectation that the Contract permitted Helix to acquire CATV services from itself by several inconsistent actions. At the outset, the Navy appeared to acknowledge that the phrase "acquire this service from another source" was problematic when it asked Helix for a proposal to delete this language. Subsequently, the Navy properly rejected Helix's proposal to delete that language and refused to pay Helix $2,642,908 as compensation for its claimed loss of ownership and rights of the CATV system, instead directing Helix to coordinate with Cable One. The Navy did not end the matter there. Rather, in its March 2, 2000 letter, the Navy implied that the Contract might enable Helix to itself become the CATV provider: "It is your decision on how to fulfill the requirements of the Contract by the alternative you choose. It is a fact that you must obtain Air Force authorization to operate CATV system at Keesler Air Base. It is also a fact that Cable One is currently the only franchise holder for the base. Obtaining the required authorization is action you have the option to pursue." Pl.'s App. at 32. Again, some three months later on June 27, the Navy further confused the matter by wrongly advising Helix to submit its unsolicited proposal for a CATV franchise to the Navy and agreeing to forward it to the Air Force Contracts office for review. Pl.'s App. at 153.

Twice more, the Navy reiterated that Helix should submit its unsolicited proposal to the Navy—on August 31, 2000 and in late October, 2000. But after Helix finally submitted its unsolicitated proposal on November 30, the Navy's contracting officer did a complete turnabout on December 14, 2000, saying "[i]n that this matter deals with an unsolicited proposal outside of our contract with Helix and is one that proposes a new service to Keesler AFB, I would be operating outside my authority to even accept such a proposal for review." Pl.'s App. at 77.

These inconsistent actions by the Navy, while unfortunate, do not entitle Helix to a benefit the Contract did not bestow. Such unauthorized actions on the part of Navy personnel cannot create a right to which Helix is not entitled as a matter of law. *See generally Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947) ("'[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority" even if the agent "may have been unaware of the limitations upon his authority"); *CACI, Inc. v. Stone,* 990 F.2d 1233, 1236 (Fed.Cir.1993) (quoting *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 371 (1963)) ("If, by ignoring statutory and regulatory requirements, a contracting officer exceeds his actual authority, the Government is not estopped to deny the limitations on his authority, even though the private contractor may have [relied] on the contracting officer's apparent authority to his detriment, for the contractor is charged with notice of all statutory and regulatory limitations.").

### Conclusion

For the foregoing reasons, Plaintiff's motion for partial summary judgment on the issue of liability is **DENIED.** Defendant's cross-motion for summary judgment is **GRANTED.** The Clerk is directed to enter judgement for Defendant. No costs.

---

it intended to provide CATV service to Keesler AFB until nearly two months after the Contract was awarded at the partnering meeting Plaintiff had with the Navy. As such, the award was not made to Plaintiff on the basis that Helix would be a CATV provider.